Laramore, Judge,
delivered the opinion of the court*:
This is an action to recover alleged overpayments of Federal income taxes paid by plaintiff for the tax year of 1954. *93 The amount in controversy involves a refund of $510,762.73, plus statutory interest on the amount of recovery. The determination of whether or hot plaintiff is entitled to recover said amount is based on sections 170 and 162 (b)[1] and whether, pursuant to section 170,[2] plaintiff is entitled to claim a deduction for charitable contributions made in the form of discounted sales of its most famous product, i.e., sewing machines.
The resolution of the above posed issue will be made in reference to what will be hereinafter referred to as the (1) school discounts and (2) discounts to charities other than schools. As for the school discounts, it is our holding that the benefits to be derived from such discounts were substantial enough to supply the plaintiff with a quid fro quo for the discount which, in turn, effectively destroyed the discounts charitable nature. However, as for the discounts to charities other than schools, we hold that the benefits derived from such discounts were merely incidental to the making of the transfer and not substantial enough to destroy the charitable contribution characterization.

Historical BaoTcgroumd

As has already been noted, plaintiff is, among many other things, a manufacturer and supplier of sewing machines to both the domestic and foreign markets. It was originally formed in 1863 as “The Singer Manufacturing Company,” a New York corporation, the state in which it operated until moving across the river to New Jersey. In 1873, the time of moving, the New York corporation was dissolved and a New Jersey corporation was formed under the same name as was used in New York. It was not until much later, in 1963, that plaintiff’s name was changed to “The Singer Company” as it appears in this case.
Today, and during the year in issue, plaintiff is a thoroughly integrated corporation which handles all phases *94 of its sewing machine business. However, it did not always operate in its present format. For example, during the year in question, 1954, plaintiff distributed its product through a wholly owned subsidiary, called “Singer Sewing Machine Company” (hereinafter referred to as “SSMCo” or “Singer”), a New Jersey corporation. It is this subsidiary that sold and distributed the machines here in question and consequently all further references to The Singer Company, as plaintiff, will be to this portion of a much more diversified corporation.

The Diseownbed Sales

During the year in question plaintiff, through SSMCo, sold 584,740 Singer sewing machines in the United States which produced a gross sales figure of $120,853,921, of which 491,005 were new machines. Of the new machines, 93.7 percent, or 460,191 were sold to the general public at plaintiff’s established retail price. An additional 1,450 machines were sold in the normal course of plaintiff’s business but at a price which was 10 percent less than retail. The remaining 29,364 new machines (6 percent of the year’s total) were sold to purchasers, not in plaintiff’s ordinary course of business and to purchasers who received various discounts. Those purchasers, along with the percentage of discount, were as follows:

Category Discount from Published Listprice

(a) Employees of the Singer organization with more than 30 percent six months of service.
(b) Foreign diplomats_ 20 percent
(c) Clothing manufacturers using Singer industrial 15 percent machines.
(d) Home economics (sewing) teachers_ 20 percent
(e) Churches and charitable organizations (other than 25 percent governments, schools, hospitals, and Red Cross).
(f) Red Cross_ 45 percent
(g) Government and nonprofit hospitals_ 45 percent
(h) Government agencies (federal, state, county, and 45 percent municipal).
(i) Public and parochial schools (i.e., schools and colleges 45 percent under federal, state, county, municipal, and parochial administration).
*95 (j) Salaried county home demonstration agents and 4-H 45 percent girls club leaders who devote entire time to extension service and need portable machines for use in their work (limited to portable machines).
(k) Army PX’s and Navy Ship Stores_ 20 percent
The total amount of machines that were sold to charitable type organizations listed above was 25,309.[3] Of that total, 21,070 new machines were sold to public and parochial schools at prices aggregating $2,733,750 or $818,535.11 below the then fair market value. These sales were made at breakeven prices and resulted in no over-all immediate net profit or loss to plaintiff. As can be seen from the chart, the discount for the school group was 45 percent. The plaintiff also sold 4,239 machines to charities other than the aforementioned school group. This included (1) churches and charitable organizations (other than governments, schools, hospitals, and the Bed Cross); (2) the Bed Cross; (3) government and non-profit hospitals; and (4) government agencies (Federal, state, county, and municipal). Discounts received, as shown by the chart, were all 45 percent except for category (1) above, which received a 25 percent discount. The total moneys received from the non-school charity discount sales amounted to $529,875 which was $127,321.80 below the then fair market value of the machines. Thus, the total discounts allowed to those organizations enumerated by section 170(c)' for the taxable year 1954 aggregated $945,856.91 which would produce a reduction in taxes paid of $510,762.73.[4] Said reduction would occur if plaintiff were allowed to deduct these discounts on its amended return.
The original Federal income tax return, a consolidated return, filed by plaintiff, included SSMCo within plaintiff’s affiliated group. Said return was timely filed with the District Director of Internal Eevenue at Newark, New Jersey and *96 made pursuant to the provisions of sections 1501 and 6012(a) of the 1954 Code which provide for the privilege and responsibility of filing a consolidated return.
Subsequent to the filing of said return, the Commissioner of Internal Eevenue conducted an audit which resulted in the assessment of certain income tax deficiencies (with interest thereon) which are not here in issue.[5] Thereafter, on December 17, 1962, and within two years from the date on which plaintiff had paid said income tax deficiencies, plaintiff filed a claim for refund (Form 848) for the taxable year 1954 in the amount of $525,640.48, plus interest, or such greater amount as may be legally refundable. Of this total, $14,878.20 related to foreign tax credits which are no longer in issue. The balance of plaintiff’s claim was based on the discounts to charitable organizations heretofore described and not theretofore claimed as a charitable contribution deduction on any of plaintiff’s income tax returns. The amount of the claimed deduction, $945,856.91, plus that amount of charitable contributions made by plaintiff’s affiliated group other than the amount here in issue, does not exceed five percent of plaintiff’s 1954 taxable income, as computed under section 170(b) (2) of the Code.[6]
Following the denial of the above noted claim for refund, suit was instituted in conformity with the provisions of sections 6532 and 7422 of the Code and jurisdiction of this court was invoked under Title 28 U.S.C. § 1346 and § 1491 (1964). Upon the filing of suit, our Commissioner Willi, after hearing testimony and considering all the evidence, submitted his findings of fact under Rule 134(h) of this court. Because of those findings, which are substantially adopt, and the nature of the case, the opinion will deal first with the issue *97 in terms of the school discounts and secondly in reference to the discounts to charities other than schools.[7]
However, before proceeding to resolve the issue, it should be noted that the parties have agreed that the organizations to which the discounts here in question were made are within section 170(c). Furthermore, there will be no further discussion concerning the question of the fair market value of plaintiff’s machines as it relates to the bargain sales here in question. We are not persuaded by the defendant’s argument that the sales in question were not made at a bargain and therefore no deduction should be allowed. We arrive at this conclusion by referring to Treasury Regulation 1.170-1 (c) (1) of the Internal Revenue Code of 1954 dealing with the contribution of property and describing the method for determining the value of property contributed. That regulation states, in its pertinent part, that:
(c) Contribution in property — (1) General rules. If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. If the contribution is made in property of a type which the taxpayer sells in the course of his business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the lowest usual market in which he customarily sells, at the time and place of the contribution (and in the case of a contribution of goods in *98 quantity, in the quantity contributed). The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom he customarily sells, unless he sells only at retail in which event it is his retail customers. If a donor makes a charitable contribution of, for example, stock in trade at a time when he could not reasonably have been expected to realize its usual selling price, the value of the gift is not the usual selling price but is the amount for which the quantity of merchandise contributed would have been sold by the donor at the time of contribution. * * *.
It is our opinion that this regulation, together with our commissioner’s finding that “only plaintiff’s retail sales to the public were arm’s-length transactions in the regular course of business reflecting the fair market value of the machines involved” (finding 14, infra) requires us to find that the sales were, in fact, made at a bargain. In so rejecting defendant’s position we are merely standing firm to the proposition that in determining fair market value one must look at “the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.” Reg. § 1.170-1 (c) (1); § 20.2081-1 (b); § 25.2512-1. See also, Mertens, Law of Federal Income Taxation (1970 Rev.), 59.07; Champion v. Commissioner, 303 F. 2d 887 (5th Cir.1962); Daniel S. McGuire, 44 T.C. 801 (1965), acq., 1966-1 Cum. Bull. 2. Thus we will proceed to discuss those questions which pose greater difficulties in resolution.

The Issue

The issue then, to make our problem perfectly clear, is whether the plaintiff can deduct, as charitable contributions in the form of bargain sales, the discounts as heretofore described. Having disposed of any problems with reference to the organizations which received the discounts, as well as recognizing that if all other requirements are met a bargain sale may produce a charitable contribution (Reg. § 1.170-1 (c), supra), the resolution of said issue depends then on considerations which involve the definition of a gift.

*99
Defendants Case: Definition of Gift

It has been advocated by the defendant that this case should be decided on the basis of the decision in Commissioner v. Duberstein, 363 U.S. 278 (1960). In that case, which has become an “old saw” to tax lawyers, the issue was whether Mr. Duberstein would be permitted to exclude from his taxable income the value of an automobile given to him by a business associate. Such an exclusion would have been pursuant to section 102 (a).[8] To resolve that issue the Supreme Court formulated a definition of a gift. The Court did so to assist them, and others, in deciding the issue under section 102(a). That definition included the following language which has become standard in many cases to be cited hereafter. Said formulation was “ [a] gift in the statutory sense, on the other hand, proceeds from a ‘detached and disinterested generosity’, Commissioner v. LoBue, 351 U.S. 243, 246; ‘out of affection, respect, admiration, charity or like impulses, Robertson v. United States [343 U.S. 711], at 714.” (Duberstein, supra, at 285; emphasis supplied). It is this language that later cases have used, not to define “gift” for purposes of section 102(a), but for purposes of defining “gift” as used in section 170(c). See, Transamerica Corporation v. United States, 392 F. 2d 522 (9th Cir.1968); DeJong v. Commissioner, 309 F. 2d 373 (9th Cir.1962). This is also the definition of “gift” that the defendant would have us follow in this case even though here we are dealing with section 170.
If we were to accept the definition of gift as it is proffered by defendant, it would then be necessary for us to look to the subjective intent of the plaintiff when awarding discounts to organizations described 'by section 170(c). This would not be an impossible task, but it would indeed be a very difficult one. It would necessitate a determination of whether plaintiff gave the discounts because they were primarily motivated by business considerations or, conversely, because of “detached and disinterested generosity” and out of “affection, respect, admiration, charity or like impulses.” *100 (Duberstein, supra, at 285). This determination, asserts plaintiff, need not, and should not be made.

Plaintiff’s Case

As an alternative to the subjective approach described above plaintiff argues that (1) the definition of “gift” as used in Duberstein, supra, does not apply to “gift” in a charitable contribution case and (2) that voluntary contributions are governed solely by I.R.C. section 170; and therefore contributions to charities should not be considered as business expense deductions under I.E.C. sections 162(a) and 162(b) unless there is a specific and direct quid pro quo flowing from the transfer.

Application of Section 162 (b) 

[9]

As plaintiff most eloquently points out, deductions for charitable contributions by corporations were originally not allowed by the Internal Revenue Code. However, in 1935, with the enactment of the Revenue Act of 1935, section 102 (c), Public Law 74-407, 49 Stat. 1014 (adding subsection (r) to section 23 of the Revenue Act of 1934), corporations were permitted to deduct charitable contributions not in excess of five percent of their net income. Plaintiff also shows that following the enactment of section 102(c) of the 1935 Act, supra, a corporation had the distinct advantage of not only deducting charitable contributions to the extent of five percent of its net income but also deducting charitable contributions in excess of five percent if it could show that the contribution was beneficial to the corporation or represented consideration for benefits flowing to the corporation. See, Fairmont Creamery Corp. v. Helvering, 89 F. 2d 810 (D.C.Cir.1937). Therefore, in 1938, Congress eliminated this advantage by enactment of section 23 (a) (2) of the Revenue *101 Act of 1938, Public Law 75-554, 52 Stat. 447, 460, which provided that
No deduction shall be allowable under paragraph (1) to a corporation for any contribution or gift which would be allowable as a deduction under subsection (q) were it not for the 5 per centum limitation therein contained and for the requirement therein that payment must be made within the taxable year.
The above section has been continued throughout subsequent revisions of the Internal Revenue Code and appears in substantially the same form today. See, section 162(b) of the Internal Revenue Code of 1954, supra. In addition, plaintiff indicates that the regulation promulgated to assist taxpayers in their imderstanding of this subsection, first appearing as Regulation 101, Art. 23(a) (13), interpretive of the 1938 Act, supra, has been perpetuated in nearly the identical form in which it first appeared. That regulation, now Treasury Regulation 1.162-15, in its pertinent part, reads as follows:
§ 1.162-15. Contributions, dues, etc.
(a) Contributions to organizations described in section 170 — (1) In general. No deduction is allowable under section 162(a) for a contribution or gift by an individual or a corporation if any part thereof is deductible under section 170. For example, if a taxpayer makes a contribution of $5,000 and only $4,000 of this amount is deductible under section 170(a) (whether because of the percentage limitation under either section 170 (b) (l) or (2), the requirement as to time of payment, or both) no deduction is allowable under section 162(a) for the remaining $1,000.
(2) Scope of limitations. The limitations provided in section 162(b) and this paragraph apply only to payments which are in fact contributions or gifts to organizations described in section 170. For example, payments by a transit company to a local hospital (which is a charitable organization within the meaning of section 170) in consideration of a binding obligation on the part of the hospital to provide hospital services and facilities for the company’s employees are not contributions or gifts within the meaning of section 170 and may be deductible under section 162(a) if the requirements of section 162(a) are otherwise satisfied.
*102 Furthermore, when. Congress put together the Internal Revenue Code of 1954, the following statement was made in reference to section 162(b) of the Internal Revenue Code:
Subsection (b) is derived from section 23(a) (1) (B) of the 1939 Code. This section provides that no business deduction is available for any contribution which would be deductible as a charitable gift, were it not for the percentage limitation on such gifts. This was the rule for corporations under section 23(a)(1)(B) of the 1939 Code and this section now extends the rule to individuals. No substantive change is made in the application of this rule. As irnder present law, it applies only to gifts, i.e., those contributions which are made with no expectar tion of a fmmcial return commensurate with the amount of the gift. For example, the limitation would not apply to a payment by an individual to a hospital in consideration of a binding obligation to provide medical treatment for the individual’s employees. It would apply only if there were no expectation of any quid pro quo from the hospital. [H. Rep. No. 1337, 83rd Cong., 2nd Sess., p. A44 (3 U.S.C.C.A.N. (1954) 4017, 4180); S. Rep. No. 1622, 83rd Cong., 2nd Sess., p. 196 (3 U.S.C.C.A.N. (1954) 4621, 4830-4831.] [Emphasis supplied]
From the above statement, plus various other sources to be mentioned hereinafter, plaintiff has built the argument that I.R.C. section 162(b) is to be applied only when the transfers or contributions of property are made with the expectation of a “specific and direct quid pro quo.” This plaintiff gleans not only from the “hospital” example used by the Regulation 1.162-15 (a) (2), supra, and the legislative statement cited above, but also from various cases, cited by plaintiff; e.g., McDonnell Aircraft Corporation, 16 T.C. 189 (1951); William T. Stover Co., Inc., 27 T.C. 434 (1956); Hartless Linen Service Company, 32 T.C. 1026 (1959); and United States Potash Company, 29 T.C. 1071 (1958). However, notwithstanding plaintiff’s thorough analysis of section 162(b), we are of the opinion that neither the example used by the regulation cited nor the cases referred to us support plaintiff’s ultimate proposition. We are of the opinion that plaintiff’s analysis, concluding with the specific and direct quid pro quo requirement, is overly restrictive and quite narrow. In this opinion we are supported by the language of the legislative committee reports put together at *103 the time of enacting I.R.C. section 162(b) wherein the language emphasized that the limitation was to apply to “gifts”, adding that gifts are contributions made with no expectation of financial return commensurate with the amount of the gift. See, S. Rep. No. 1622, supra. See also, Sarah Marquis, 49 T.C. 695 (1968) wherein the Tax Court found that section 162(b) was not applicable solely to those cases where the quid pro quo had been specifically contracted for. In that case, the Tax Court rejected such a position as being a narrow interpretation of the regulations by the Commissioner and found that the taxpayer could deduct payments to charitable organizations as a business expense. Marquis, although not directly in point here since plaintiff does not advocate the necessity of a contract, strengthens our position by showing that there is a propensity to construe section 162(b) too narrowly. Just as the Commissioner of Internal Revenue so construed the section and its regulation, we feel plaintiff here has narrowly construed I.R.C. section 162(b) and the regulation pursuant thereto.
By concluding as we do with reference to section 162(b) we, in effect, reject plaintiff’s first argument that section 170 has exclusive control over all voluntary and gratuitous transfers to charities. In other words, we are of the opinion that if the transfer to a charitable organization does not qualify as a section 170 type deduction because it is made with expectations of financial return commensurate with the gift, it might be deductible under section 162(a), if all other requirements are met.[10] This is the case even if the benefits expected do not flow directly from the transferee and even though the transfer was made without compulsion. This position is entirely consistent with tire statutory scheme and, in our opinion, makes for a much more efficient and workable solution to this type of case than does the test proposed by plaintiff. Moreover, it is consistent with our opinion on plaintiff’s argument as to the definition of a “gift” as developed by the Duberstein case.

*104
Application of Duberstein

That position, to reiterate, is that the definition of a “gift”, as enunciated by the Duberstein case, supra, has no relevance to the definition of a “gift” in respect to a charitable contribution pursuant to I.R.C. section 170. In particular, plaintiff argues that the “disinterested generosity” standard, which was alluded to by Duberstein, supra, and frequently used thereafter, should not be applied to business corporations.
One of the most persuasive arguments plaintiff makes in the case against “disinterested generosity” is that those provisions which allow exclusions from gross income are matters of “legislative grace” and subject to narrow construction. (See, Mertens, Law of Federal Income Taxation, sections 3.07, 3.08 (1969 Rev.), 25.03 (1966 Rev.). One such provision, plaintiff points out, is I.R.C. section 102(a). However, and unlike section 102(a), the allowance for charitable contributions has been referred to as a “liberalization[s] of the law in the taxpayer’s favor, * * * begotten from motives of public policy, and * * * not to be narrowly construed.” Helvering v. Bliss, 293 U.S. 144, 151 (1934). See also, Old Colony Trust Co. v. Commissioner, 301 U.S. 379 (1937); Pleasants v. United States, 86 Ct. Cl. 679, 22 F. Supp. 964 (1938), aff’d 305 U.S. 357 (1939). Therefore, the definition of a gift, plaintiff asserts, as applied to a section to be narrowly construed, i.e., I.R.C. section 102(a), should have no effect on a section which is a liberalization of the tax law.
Notwithstanding plaintiff’s approach to this problem, it appears that the case law in this area has not entirely agreed with the proposition advocated by plaintiff. For example, in the Ninth Circuit Court of Appeals, DeJong v. Commissioner, 309 F. 2d 373 (9th Cir.1962), aff'g, 36 T.C. 896 (1961) the test of “disinterested generosity” was applied to a section 170 charitable contribution question. It was also applied in reference to section 170 in Transamerica Corporation v. United States, 254 F. Supp. 504 (N.D. Cal. 1966), a lower court decision influenced by the DeJong case and later criticized with new reasoning injected by the Ninth Circuit, see, 392 F. 2d 522 (9th Cir.1968). Moreover, the Tax Court has used the disinterested generosity test in “section 170 cases” such as S. M. Howard, 39 T.C. 833 (1963); Crosby Valve & *105 Gage Company, 46 T.C. 641 (1966), which, was later affirmed but on a basis other than that used in Duberstein, 380 F. 2d 146 (1st Cir.1967), cert. denied, 389 U.S. 976 (1967). More recently the Tax Court has applied the disinterested generosity test in Donald W. Fausner, 55 T.C. 620 (1971) and Harold E. Wolfe, 54 T.C. 1707 (1970).
On the other hand, the “disinterested generosity” test, in reference to business corporations, has been specifically rejected in the appeal of Crosby Valve & Gage Company, supra; Transamerica, supra; and weakened in Sarah Marquis, 49 T.C. 695 (1968). See also, Estate of O. J. Wardwell v. Commissioner, 301 F. 2d 632 (8th Cir. 1962), rev'g, 35 T.C. 443 (1960); Citizens & Southern National Bank of South Carolina v. United States, 243 F. Supp. 900 (W.D.S.C. 1965); Jordan and Essie Perlmutter, el al., 45 T.C. 311 (1965) and a Law Review Note, “Disinterested Generosity: An Emerging Criteria of Deductibility Under Section 170,” 1968 Utah Law Review 475. The test, discussed in the above cases, as well as others not cited herein, is obviously not one that can be applied with the assumption that the most judicious approach to the problem has been used. It is for the above reason, plus a feeling of uneasiness about using such an approach, that we avoid resting our decision on the “disinterested generosity” rules.
Indeed, we are not the first court to refuse to apply the Duberstein rationale. See, Marquis, supra; Stubbs v. United States, 428 F. 2d 885 (9th Cir. 1970), cert. denied, 400 U.S. 1009 (1971); Jerome Scheffres, 28 CCH T.C. Mem. Dec. 234 (1969); Ben I. Seldin, 28 CCH T.C. Mem. Dec. 1215 (1969); The Jefferson Mills, Inc. v. United States, 367 F. 2d 392 (5th Cir. 1966); Wegner v. Lethert, 67-1 U.S.T.C. ¶ 9229 (D. Minn. 1967). In most of those instances where the disinterested generosity test has not been used the cases have dealt with the question of deductibility of a transfer as a “gift” in terms of whether the transferor received, or expected to receive, something in return for that transfer. If the transfer was made with the expectation of receiving something in return as a quid pro guo for the transfer then in such an instance the I.E.C. section 170 deduction was denied. Marguis, supra; Perlmutter, supra; Transamerica, supra; *106 Stubbs, supra. See also, Allis-Chalmers Mfg. Co. v. United States, 200 F. Supp. 91 (E.D. Wisc. 1961). Tlie denial of a charitable contribution on such a basis also finds support in earlier cases such as Bogardus v. Commissioner, 302 U.S. 34 (1937) and Channing v. United States, 4 F. Supp. 33 (D. Mass. 1933), aff'd per curiam, 67 F. 2d 986 (1st Cir. 1933), cert. denied, 291 U.S. 686 (1934), and in the legislative history of the Internal Revenue Code of 1954 where it was stated that charitable gifts are “those contributions which are made with no expectation of financial return commensurate with the amount of the gift.” H. Rep. No. 1337, supra; S. Rep. No. 1622, supra.
Plaintiff does not disagree that the above described alternative to the “disinterested generosity” test is relevant. It does, however, reduce that alternative to the rather narrow interpretation advocated in reference to section 162 (b), supra. That is, plaintiff would have us decide the case by distinguishing between a direct or indirect benefit derived. In other words, plaintiff would say that if the transferor received, or expected to receive, benefits from a transfer to a charitable transferee, which benefits were to be received only indirectly, then regardless of the magnitude of those benefits, the transfer would still qualify as a charitable contribution deduction under section 170. However, if those same benefits were received, or expected to be received, directly from the transferee, plaintiff would concede that, given a substantial quid pro quo, the transfer would not come within the definition of a “gift” or “contribution” for purposes of deductibility under section 170. Obviously, we cannot agree with plaintiff’s distinction. It is our opinion that if the benefits received, or expected to be received, are substantial, and meaning by that, benefits greater than those that inure to the general public from transfers for charitable purposes (which benefits are merely incidental to the transfer), then in such case we feel the transferor has received, or expects to receive, a quid pro quo sufficient to remove the transfer from the realm of de-ductibility under section 170. With this standard, we feel that the subjective approach of “disinterested generosity” need not be wrestled with and we are of the opinion that our approach coincides perfectly with our reading of section 162 (b). More *107 over, we do not feel that this approach differs with, or in any way conflicts with, pronounced policies of the Internal Bev-enue Service. For example, in Bevenue Buling 67-416,1967-2 Cum. Bull. 119, the Service was concerned with the deducti-bility of contributions to a city by a number of taxpayers; the contributions were used for removal of an unused and unsightly railroad terminal. In allowing the charitable contribution deduction, the Commissioner stated:
Although the merchants and owners of property in the central shopping area may receive some benefit from the removal of the railroad facilities from the city, such benefit, if any, is incidental in the comparison to the benefits accruing to the public at large.
Likewise, we do not feel that Revenue Ruling 68-314, 1968-1 Cum. Bull. 101 (as superseded by Revenue Ruling 68-658, 1968-2 Cum. Bull. 119) is inconsistent with our approach mainly because the ruling was issued in relation to an issue unrelated to the issue dealt with here. Secondly, in Situation (2) of Rev. Rul. 68-314, the one referred to by plaintiff as supportive of its position, it is true that the taxpayer donated paintings to a museum with the avowed purpose of stimulating public interest in the display so as to enhance the value of other paintings by the same artists. This, of course, provides benefits to the donor; however, we do not contend that absolutely no benefits can be derived from an otherwise charitable contribution or gift. (See, Citizens & Southern National Bank of South Carolina, supra, at 904). It is only when the benefits derived are substantial enough to provide a quid pro quo for the transfer that the deduction is not allowed. Apparently, the Commissioner did not feel that such a situation existed in Situation (2) of Rev. Rul. 68-314 and 68-658, supra. See also, Revenue Ruling 69-90, 69-1 Cum. Rull. 63, and Revenue Ruling 67-446, supra, which are consistent with this approach. Such approach, as applied to the facts of this case, produces the following results.

The School Discounts

As for the discounts allowed to the public and parochial schools, our commissioner has found, in finding 97, infra, that the discounts to the schools were offered
*108 for the predominant purpose of encouraging those institutions to interest and train young women in the art of machine sewing; thereby enlarging the future potential market by developing prospective purchasers of home sewing machines and, more particularly, Singer machines — the brand on which the future buyers learned to sew. [Emphasis supplied.]
It is from this finding, together with careful scrutiny of other relevant facts, that we hold these discounts not to be of a charitable nature.
In arriving at this conclusion we have considered plaintiff’s long history of generosity in its cash contributions. See findings 25-30. In addition, we have noted carefully the competitive position of Singer in relation to other manufacturers and distributors of sewing machines. See findings 59-73, infra, and especially finding 58 wherein our commissioner found that “even if it [plaintiff] had a total monopoly in the sewing machine field, it would still offer the schools the 45 percent discount.” Notwithstanding the generosity shown by the cash discounts and the competitive position of plaintiff, we are convinced, as was our commissioner, that the plaintiff’s predominant reason for granting such discounts was other than charitable. We are not persuaded otherwise by plaintiff’s competitive position because our commissioner went on to find, in finding 58, infra, that plaintiff, although allowing the discounts even with a total monopoly, “would still be interested in increasing the size of that market by supporting the schools’ efforts in teaching young women to sew.” Nor are we influenced to find otherwise by plaintiff’s evidence that a survey, conducted in 1961, showed that only 1.75 percent of SSMCo’s regular retail customers were influenced in buying a Singer machine by previous school training. This fact, if one accepts survey results as foot, does not change our opinion because even if plaintiff’s expectations were not realized, the nature of the transaction is not changed from its initial character. Stubbs v. United States, supra. That character, as described heretofore, was of a business nature and not charitable. We are convinced, and so hold, that in reference to the discounts granted to the schools, plaintiff expected a return in the nature of future increased *109 sales. This expectation, even though perhaps not fully realized, provided a quid fro quo for those discounts which was substantial. We, therefore, deny the deduction for discounts to the school group.

Charities Other Than Schools

As for those charities other than the schools, we are of the opinion that from said non-school groups the plaintiff did not expect to receive substantial benefits in return for the discounts allowed. We are convinced that any benefits to be derived from such discounts were merely incidental to the charitable nature of the transfer and, therefore, do not destroy the claimed charitable contribution deduction. In other words, we agree with our commissioner in his finding 98, infra, that the
primary purpose of such discounts was to assist the recipient organizations in the performance of the charitable, religious or public services that they were currently providing. The incidental effect of this policy was the development and maintenance of a favorable public image for plaintiff in the eyes of those organizations and their members.
Such a finding, together with our agreement therewith, makes it difficult to see how the plaintiff could derive substantial benefits from such discounts in the way of increased sales. Therefore, we hold that plaintiff is entitled to deduct, as charitable contributions under section 170, $127,321.80 which is the amount claimed in reference to the non-school charities. However, for reasons indicated heretofore, we cannot allow the deduction of those discounts to the schools and as a consequence thereof, plaintiff is entitled to recover only to the extent so indicated, and beyond that plaintiff’s petition is dismissed. Accordingly, judgment shall be entered for plaintiff in an amount to be determined under Rule 131 (c).
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner George Willi, and the briefs and argument of counsel, makes findings of fact as follows:

*110
Plaintiffs Structure and, Business

1. Plaintiff is a New Jersey corporation with, executive offices in New York City. It was originally formed in 1863 as “The Singer Manufacturing Company,” a New York corporation. The business had theretofore been operated as a partnership for approximately 11 years. In 1873, when the principal manufacturing plant was moved to Elizabethport, New Jersey, the New York corporation was dissolved and succeeded by the present New Jersey corporation, also originally called The Singer Manufacturing Company.
2. Plaintiff’s principal business has traditionally been the manufacture of Singer brand sewing machines and related products for both industrial and household use. Plaintiff and its predecessors have been making Singer brand sewing machines since 1852, and at least since 1950 plaintiff has been the dominant producer of family sewing machines in the United States.
3. From 1950 through 1954, plaintiff owned and operated sewing machine manufacturing plants at Elizabethport, New Jersey; Bridgeport, Connecticut; and St. Johns, Quebec, Canada. It also had its own lumber mills and woodworking factories at South Bend, Indiana, and Thurso, Quebec, Canada, for the manufacture of sewing machine cabinets, tables, and stools. Similar operations were conducted at Pickens, South Carolina, and Truman, Arkansas, through plaintiff’s wholly-owned subsidiary, Poinsett Lumber and Manufacturing Company. At Finderne, New Jersey, Diehl Manufacturing Company, another of plaintiff’s wholly-owned subsidiaries, manufactured motors and other electrical equipment for the domestically manufactured Singer sewing machines. Between 1950 and 1959 plaintiff had a 28%-percent interest in a corporate affiliate manufacturing Singer sewing machines at Clydebank, Scotland, and a one-third interest in International Securities Company — a company that had sewing machine manufacturing subsidiaries with plants in France, Italy, Germany, and Brazil. The output of these overseas plants was sold either by plaintiff’s wholly-owned subsidiary, Singer Sewing Machine Company, or a sales subsidiary of International Securities Company. Since 1954, *111 plaintiff has increased its percentage interest in its Scottish affiliate and has formed additional manufacturing subsidiaries in Canada, Mexico, Turkey, and the Philippines.
4. In 1959, International Securities Company became a wholly-owned subsidiary of plaintiff and in 1963, plaintiff’s name was changed from “The Singer Manufacturing Company” to “The Singer Company,” which it has remained.
5. In 1954, the year in suit, plaintiff distributed all products that it sold in the United States through its wholly-owned subsidiary, Singer Sewing Machine Company (hereinafter referred to as “SSMCo” or “Singer”), a New Jersey corporation formed in 1904 and having executive offices in the same New York City building housing plaintiff’s offices.
6. Plaintiff and its domestic subsidiaries (“plaintiff’s Affiliated Group”), including SSMCo, have filed consolidated federal income tax returns since 1948.

Business of Singer Sewing Machine Company ("SSMCo")

7. SSMCo was strictly a selling or distributing organization ; and, until 1963 (finding 10, infra), it was the exclusive marketing organization for the distribution of Singer brand products in the United States.
8. The executive office of SSMCo in New York City included (in addition to various foreign sales departments) a United States family sewing machine department and a United States manufacturing trade department, each of which was headed by a vice president. The United States family sewing machine department handled all of SSMCo’s sales of family or household sewing machines in the United States and Canada. SSMCo was organized and run from the top — from the executive office in New York City, to the central agencies headed by a general agent, to district managers, to the sewing centers.[1] During the year 1954, *112 SSMCo had an average of 15,232 employees in the United States.
9|. In 1954, SSMCo maintained approximately 1,500 sewing centers throughout the United States and sold its family sewing machines only through these Singer sewing centers. The number of Singer sewing centers varies from year to year from about 1,500 to 1,700. Today Singer sewing machines are distributed not only through these Singer sewing centers, but also by a few dealers in the more remote areas, by some “lease departments” in department stores such as Macy’s in New York City, and by some premium houses such as MacDonald. Each Singer sewing center has a manager and sales personnel varying in number, depending upon the size of the center. Each Singer sewing center has at least one full-time sewing teacher and a full- or part-time service or repairman.
10. In 19.63, SSMCo transferred its United States business (and all related assets and personnel) to plaintiff where it has continued operations to date as one of the latter’s divisions. Since that transfer, the name of the United States family sewing machine department has been changed to the consumer products division, headed by a vice president of the plaintiff.
11. The educational department of the consumer products division has always been primarily responsible for the instruction of all new Singer sales and teaching personnel and for the programs of sewing instruction offered to the general public at the Singer sewing centers. In addition to developing and implementing new sales demonstration techniques and programs of instruction, the educational department has developed teaching materials and aids for use in the Singer sewing centers.
12. At the executive office level in New York City, the educational department has throughout the years been headed *113 by an educational director, who has had and now has a staff consisting of several assistants, as well as 7 or 8 educational supervisors. The educational supervisors at the executive office have spent and still spend a substantial portion of their time in traveling to the central agencies for the purpose of disseminating new material, methods, techniques, and information, and consulting with their counterparts at the agency level. Each central agency has had and still has from one to three educational supervisors on its staff who were and still are primarily concerned with the direct supervision of the sewing teachers at the sewing centers. These agency educational supervisors have traveled and still travel to the sewing centers throughout their agency area, disseminating new materials, techniques, methods, and information to the sales and teaching personnel of such centers. In all, there were and still are approximately 75 educational supervisors at both the executive office and central agency levels.
13. At least for the period 1950 to date the executive office of SSMCo, and since 1963 the executive office of plaintiff, has determined the prices at which Singer sewing machine units and parts are to be sold throughout the United States. From time to time, the Singer executive office issues so-called Form 90’s to its central agencies and sewing centers, indicating, among other things, the current list price for new heads, cabinets, stools, and other items; information in regard to carrying charges on purchases made on the installment plan; and information on trade-in allowances on used sewing machines.
14. During the year 1954, plaintiff sold 584,740 Singer machines to consumers through its retail shops in the United States at prices aggregating $120,853,921 — of which 491,005 were new machines. Of those new machines 460,191 (93.7 percent of the total) were sold to the general public at plaintiff’s established retail list prices. An additional 1,450 machines were also sold to consumers in the regular course of plaintiff’s retail business, but at prices that were 10 percent below retail list. The remaining 29,364 new machines (6 percent of the year’s total) were sold to the types of purchasers described in finding 16, infra, and at the discounts specified therein. The evidence shows that the prices at which plain *114 tiff sold its machines to the general public, including such discounts as were extended to the general public, were determined solely with a view to the realization of maximum profit, consistent with volume, on such sales. The discounts applied to the remaining 29,364 machines were not primarily granted for the purpose of attaining similar commercial objectives. See findings 96 and 97, infra. It is therefore concluded that only plaintiff’s retail sales to the public were arm’s-length transactions in the regular course of business reflecting the fair market value of the machines involved.

The Issue

15. Of the 491,005 new machines sold by plaintiff in 1954, 25,309 were sold to organizations of the type enumerated in section 170(c) of the Internal Revenue Code of 1954. These sales were made at various cash discounts from plaintiff’s prevailing list prices and the deductibility of the amount of those discounts for federal tax purposes is the sole issue involved in this suit.

Basis of Plaintiff’s Claim

16. For many years, plaintiff has had a policy of granting discounts from its published list price on the sale of new family sewing machine units to certain categories of individuals and organizations within the United States. Unlike the case of cash contributions, finding 25, infra, granting of this price discount was never submitted to or approved by either plaintiff’s board of directors or that of SSMCo. The following discounts were given by plaintiff on family sewing machine units during the year 1954:

Category Discount from \PuVHsJie3, List price

(,a) Employees of the Singer organization with more 30 percent than six months of service.
(b) Foreign diplomats_20 percent
(c) Clothing manufacturers using Singer industrial 15 percent machines.
(d) Home economics (sewing) teachers-20 percent
(e) Churches and charitable organizations (other than 25 percent governments, schools, hospitals, and Bed Cross).
(f) Bed Cross_45 percent

*115
Discount from Category Published List price

(g) Government and. nonprofit hospitals-45 percent
(b) Government agencies (federal, state, county, and 45 percent municipal).
(1) Public and parochial schools (ie., schools and col- 45 percent leges under federal, state, county, municipal, and parochial administration).
(j) Salaried county home demonstration agents and 4-H 45 percent girls club leaders who devote entire time to extension service and need portable machines for use in their work (limited to portable machines).
(k) Army PX’s and Navy Ship Stores_ 20 percent
All of the above discounts were determined at the Singer executive office in New York City.
17- During 1954, plaintiff sold new family sewing machine units to public and parochial schools throughout the United States at the 45-percent discount. Plaintiff sold 21,070 family sewing machine units to public and parochial schools at prices aggregating $2,633,750 or $818,535.11 below the then fair market value of such machines as determined in finding 14, supra. These sales to schools were made at break-even prices, and resulted in no overall net profit or loss to plaintiff’s Affiliated Group.
18. In 1954, plaintiff also sold new family sewing machine units to: (1) churches and charitable organizations (other than governments, schools, hospitals, and the Red Cross) ; (2) the Ned Cross; (3) government and nonprofit hospitals; and (4) government agencies (federal, state, county, and municipal), all at a 45-percent discount except category (1) which was at a 25-percent discount. Plaintiff sold 4,239 family sewing machine units to these institutions at prices aggregating $529,875 or $127,321.80 below the then fair market value of such machines as determined in finding 14, supra. The aggregate sales to these institutions resulted in a small overall net profit to plaintiff’s Affiliated Group.
19. The public and parochial schools (finding 17, supra) and the other institutions (finding 18, supra) were all organizations of the type described in section 170(c) of the 1954 Internal Revenue Code.
20. On or about October 10, 1955, within the time prescribed by law, plaintiff filed with the District Director of *116 Internal Revenue at Newark, New Jersey, a consolidated federal income tax return on United States Treasury Form 1120 for the year 1954 for its Affiliated Group pursuant to the provisions of sections 1501 and 6012 (a) of the 1954 Code, and paid the tax shown thereon.
21. The Commissioner of Internal Revenue subsequently conducted an audit of the 1954 consolidated return. In the course of that examination, plaintiff and the District Director executed a series of agreements on United States Treasury Form 872 which extended until June 80, 1962, the period within which federal income tax deficiencies could be assessed with respect to the 1954 consolidated return. Upon completion of the examination and audit and as a result of adjustments not presently in issue, the Commissioner asserted against the plaintiff, and plaintiff paid certain income tax deficiencies and interest thereon.[2]
22. On December 17, 1962, and within 2 years from the date on which plaintiff paid the deficiencies and interest referred to in finding 21 and footnote 2, plaintiff filed with the District Director a claim for refund, Form 843, for 1954 in the amount of $525,640.93, plus interest, or such greater amount as may be legally refundable. Of the total amount of the refund claim filed by plaintiff, $14,878.20 related to foreign tax credits which have since been allowed and are no longer in issue. The balance of plaintiff’s claim, in the amount of $510,762.73, was based upon the discounts on sales to schools and charities. Such discounts had not been claimed as deductions on the 1954 consolidated return. The total discounts *117 later claimed as deductions under section 170 of the 1954 Code aggregated $945,856.91, the bulk of which arose from discount sales to schools. The charitable contributions made in 1954 by plaintiff’s Affiliated Group, exclusive of these discounts, aggregated $279,428.75. The discounts claimed as 1954 charitable deductions in this suit plus plaintiff’s cash contributions to charity in that year total less than 5 percent of its 1954 taxable income, as computed under section 170(b) (2) of the Internal Revenue Code of 1954.
23. The total discounts claimed as a deduction under section 170 — $945,856.91—represented the difference between the published list prices for the sewing machines and the discount prices at which the machines were sold to schools, the United States Government, and other charitable institutions. (Findings 17 and 18, supra.) Plaintiff’s refund claim based on these discounts was formally disallowed, and this suit was timely brought.
24. All procedural and jurisdictional requirements for the institution and maintenance of the action herein have been fully complied with.

Cash Contributions to Charity

25. Although it has never made any outright donations of sewing machines or other merchandise to charities or any other recipients, for many years prior to 1954 plaintiff’s Affiliated Group made annual cash contributions to national and local charitable institutions. These sums were claimed and allowed as charitable contribution deductions on their income tax returns for such years. Such cash contributions were invariably specifically approved by plaintiff’s board of directors.
26. From 1939 through 1959, these cash contributions aggregated $5,273,958.40, of which $4,144,341.92 was contributed by plaintiff and $974,798.73 was contributed by SSMCo.
27. From 1951 through 1959, the annual cash contributions to charities in the United States made by plaintiff’s Affiliated *118 Group have ranged between $283,500 and $359,300. The Group’s contribution in 1954 was $279,423.75 — of which. $63,877.50 represented contributions made by SSMCo to community chests in the various communities where its shops and employees were doing business, and a $125,000 contribution made by plaintiff to the Red Cross.
28. From 1941 through 1959, the following annual contributions were made in cash to the Red Cross by plaintiff and/or SSMCo:
1941 _$82,500 (plaintiff)
1942 _ 150,000
1943 _ 250, 000 ”
1944 _ 225, 000
1945 _ 60,000
”_ 75,000 (SSMCo)
1946 _ 45,000
” _ 35,000 (plaintiff)
1947 _ 100, 000 ”
1948 _ 80,000
1949 _ 50 ”
1950 _ 90,000 ”
1951_ 130,000 ”
1952 _ 125,000 "
1953 _ 125,000 "
1954 _ 125,000 ”
1955 _ 135,000 ”
1956 _ 125,000
1957 _ 125,000 ”
1958 _ 8,500
1959 _ 15,230 (SSMCo)
29. The cash contributions described in findings 25 through 28, supra, were primarily motivated by (i) a desire to contribute to the welfare of the communities in which the contributing members of plaintiff Affiliated Group were doing business, (ii) a desire to create and maintain, in the eyes of the recipient organizations and their individual members, a favorable image as responsible corporate citizens, and (iii) in the case of the Red Cross contributions, a desire to help that organization meet the emergency needs with which it was faced during and after World War II and during and after the Korean War. The evidence shows that these cash grants were not substantially motivated or influenced by considerations of commercial benefit.
*119 30.Plaintiff also made the following cash contributions to War Relief Funds during World War II:
1941 — USO _ $5,000
1942 — USO _ 5,000
Navy Relief Fund_ 5,000
Russian War Relief Fund_ 5,000
British ” ” ”_ 5,000
United China ” ”_ 5,000
Greek War ” ”_ 5,000
1943 — National War Fund_ 83, 750
1944— ” ” ”_ 100,000
1945— ” ” ”- 100,000

Discounts to Public and Parochial Schools

31. For many years beginning prior to 1954, Singer has conducted regular classes in home sewing at virtually all of its retail shops in the United States.
32. Singer has always had and still has an objective of enlarging the total market for family-type sewing machines, and its educational programs and activities, both through the schools and through its own sewing centers, are directed toward the encouragement and increase of home sewing. Singer’s sewing classes and the sewing classes in the public and parochial schools have helped in the past and still help to maintain or expand the potential market for household sewing machines. Singer’s sewing classes and the sewing classes in the schools both serve Singer’s long-standing objective of enlarging and broadening interest and participation in home sewing.
33. Singer’s policy of granting discounts to schools on their purchases of sewing machines goes back at least to 1913. At that time schools received a 40-percent discount. The discounts were granted, among other reasons, because Singer had come to recognize that one of the best methods of promoting its machines was to have schools use them; the theory being that if children in schools were taught to sew on a Singer, they would likely incline towards that brand of machine in making a purchase selection in later years.
34. By 1923, Singer’s close cooperation with school authorities had significantly increased the demand for its sewing machines and service. At that time the executive office urged *120 the field organization to do everything possible to more firmly establish the name of Singer in that “valued trade.”
35. From 1913 to 1933, the school discount remained at 40 percent. In 1933, it was set at 45 percent off the published list price for family sewing machine units and has remained substantially at that rate up to the present time.[3] The 45-percent school discount has always been at or about the break-even point. Singer does not intend to sell its sewing machines to schools at either a profit or a loss.
36. SSMCo’s school discounts were limited to public and parochial schools because Singer was interested in assisting only those schools that were being operated for the benefit of the general public, and management had no desire to reduce the costs of any school being operated for private profit.
37. The discounts on Singer machines extended by plaintiff to public and parochial schools in 1954 were granted without any strings attached, and without any obligation whatever on the part of the schools to do, or refrain from doing, anything in return therefor. Although it was presumed that such schools would use the machines in their sewing classes, they were not specifically bound to do so.
38. Plaintiff’s 45-percent school discount from list price on Singer machines in 1954 was uniform throughout the United States, and was granted on each sale to public and parochial schools without regard to the location of the school or the model or quantity of machines involved in the sale.
39. On December 16, 1947, and again on June 18, 1948, plaintiff advised all of its central agencies and shops in the United States of its continuing policy of granting a 45-percent discount on Singer machines to public and parochial schools — despite the fact that there was a pent-up consumer demand and backlog of orders for such machines following World War II which was not satisfied until 1949 or 1950.
*121 40. On January 15, 1958, plaintiff again advised all of its central agencies and stops in the United States of its continuing policy of granting a 45-percent discount to public and parochial schools on all Singer machines — despite the fact that there were not enough Singer Zig-Zag machines (introduced around May 1957) available to fill all of plaintiff’s orders therefor until October 1958.
41. Since it had been in effect for more than 40 years, the Singer school-discount policy was presumably generally known among schools and home economics teachers by 1954. Most of the home economics teachers in the schools, both in the past and today, learned to sew on Singer sewing machines, and home economics teachers, to whom plaintiff extended a 20-percent discount, are frequently influential in determining the type of sewing machines to be purchased by their schools. Though it had not done so theretofore; in about 1925, Singer began to advertise its special school discounts and its discounts for home economics teachers.
42. In addition to the 45-percent discount granted to the schools, Singer aids and encourages the public and parochial schools to teach sewing in various other ways. For example, it is known that by 1913 Singer had developed wall charts and booklets for use by teachers and sewing students in school classrooms. Over the years, the Singer educational department has had a continuing interest and active role in assisting schools and colleges that provide courses in the art of home sewing, and has developed teaching materials and aids for use in such courses, similar to the teaching-materials and aids used in the Singer sewing centers. Over the years and at the present time, there has been a large variety of these teaching materials and aids, such as textbooks, student instruction books or manuals, classroom wall charts, color filmstrips (with or without sound recordings), threading charts, stitching charts, and other test charts. These materials have always been and still are made available to home economics teachers and students free or at reduced prices.
43. Plaintiff has also made special efforts to provide the public and parochial schools with prompt and efficient service on their Singer machines. Plaintiff was in a position to *122 provide such prompt service to all of such, schools because each one of its 1,500 retail shops was (i) adequately equipped with parts and repair facilities, (ii) adequately staffed with training sendee personnel who were Singer employees, and (iii) conveniently located near the schools requiring such service.
44. By 1954, the reputation of the Singer organization for sewing machine quality and service had been well established in the United States for about 100 years, and at least 90 percent of the sewing machines then being used by public and parochial schools in the United States were Singer machines. For these reasons, among others, plaintiff was as concerned about the bad will that might develop if the Singer machines in the schools were not maintained in good operating condition as it was about the potential for obtaining advertising or brand loyalty benefits from the schools’ use of its machines.
45. At present, as in the past, the educational department sends representatives to, and prepares exhibits for, conventions of home economics teachers, school administrators, and school business officials, such as the conventions of the American Home Economics Association, the American Association of School Administrators, and the Association of School Business Officials.
46. Although they receive no commissions on sales to public and parochial schools, Singer sewing center managers are encouraged to keep in close contact with the schools in their areas; and in a particularly important school district, the district manager himself is urged to keep in contact with the schools. While visiting a sewing center, an educational supervisor from the central agency will also occasionally visit schools in the area and consult with home economics teachers on new methods or techniques developed by Singer concerning the operation and use of Singer machines, and on methods of instructing students thereon. (See finding 12, supra.) Advertising directed to the home economics teachers and school officials urges the schools to call for demonstrations, which are given by the sewing teacher at the Singer sewing center or by the manager or possibly by one of the *123 educational supervisors from the Central Agency, if an important school system is involved.
47. Singer designs special equipment specifically for the schools; such as special machine heads, combination sewing- and-cutting tables, and cabinets. As early as 1929, Singer developed cabinet styles designed especially for schools and not intended for general sale. Over the years, certain models of tables and cabinets have been designed more for school use than for general use.
48. In 1951, Singer developed a special combination sewing-and-cutting table designed to accommodate two sewing machines placed diagonally opposite each other. It hoped that this combination would 'be helpful in overcoming competition since none of Singer’s competitors, to its knowledge, had anything like it. The design of that combination sewing-and-cutting table was perfected between 1951 and 1954. When the sale of this newly-perfected item was launched with an extensive advertising campaign, the Singer sales promotion director took the occasion to remind the entire field organization that the future school market was a tremendous one and warranted greater cultivation than ever before.
49. The advertising campaign for the combination sewing- and-cutting table continued from 1954 through 1957. In 1958, SSMCo began to advertise a new three-way Singer sewing desk — cutting table, sewing desk, study desk — and Singer continues to bring out new models of cabinets, combination tables, and desks for schools. Singer develops such new lines of cabinetwork to meet the needs of the “expanding school market for sewing machines.” Responsible Singer officials have long been and still are keenly aware of this expanding school market.[4]
50. The Singer field organization is always alert to new school construction, and Singer wants to see that schools generally have as many sewing machines as they need to sustain and extend the school sewing program. Singer has a special *124 order form for use only by schools. On this special form are set forth the Singer school-discount policy, the Singer service policy and guarantee, and information about various Singer teaching aids for instructors and students.
51. Singer has long offered and still offers free service to the schools for the life of the machines for oiling, cleaning, adjusting and otherwise keeping the sewing machines in good working order. It does not extend that same free service to its regular retail customers. The schools also receive a 25-percent discount on replacement parts and supplies, which Singer’s regular retail customers do not receive. This free school service is widely advertised or otherwise communicated to the schools.
52. If a school has no home economics department or no sewing program, Singer encourages the school to start such a department or sewing program. Singer’s educational department will assist schools in setting up a sewing curriculum, if they do not have such a program, and this service is advertised in magazines directed to school executives and home economics teachers. Some of the more recent advertising to encourage the development or improvement of sewing classes in the public and parochial schools features slogans such as: “You know all about the ‘new math’ * * * but is your school teaching the ‘new sewing’?” and “* * * but can she cook or sew?”
53. Since 1950, Singer has regularly 'advertised in educational journals or publications directed to home economics teachers, school administrators, and school business officials, such as “The School Executive,” “The Nation’s Schools,” “School Management,” “What’s New in Home Economics,” and “Forecast for Home Economics.” Advertising in regard to the special school discount, new sewing cabinets, tables, or desks designed especially for school use, the availability of curriculum-planning assistance and the free school service has been mentioned above. In addition to such advertising, Singer also conducts, particularly in recent years, extensive advertising campaigns to introduce the latest sewing machine models to schools. Advertising campaign slogans such as “Presenting the SINGER SLANT-O-MATIC * * * the finest sewing machine ever built for home or school use” or *125 “Teacher’s Pet * * * now and years from now. Newest Touch & Bern sewing machine by Singer” are used.
54. Singer advertises in the magazines referred to above, among others, and the increase in the volume of its school advertising parallels the increase in its general advertising. Generally, the ads which appear in the educational publications are aimed at teachers, school administrators, and school business officials and are not the same as the Singer ads which appear in publications of general circulation. Recently, however, the Singer slogan “What’s new for tomorrow is at SINGES today!” has been used in the Singer school advertising as well as in its general advertising.
55. More young women now learn to sew in school than in the home, and Singer is aware of that fact.
56. By teaching young women to sew, the schools share the educational job that Singer would either have to do on a larger scale itself or leave undone.
57. At all times material to this case, at least 90 percent of the sewing machines in the public and parochial schools in the United States were Singer machines. Singer has long had the bulk of school sales. Plaintiff’s present predominant position in the schools is largely attributable to its early recognition of the importance of the school field, its early development of a comprehensive school program, and its vigorous and sustained efforts in the school field.
58. Plaintiff’s policy is such that, even if it had a total monopoly in the sewing machine field, it would still offer the schools the 45-percent discount, because it would still be interested in increasing the size of that market by supporting the schools’ efforts in teaching young women to sew.

Singer's Oomfetitwe Position

59. Since 1950, Singer’s principal competitors for family sewing machine business in the United States have been the distributors of machines made in Europe and Japan — particularly the Japanese machine distributors. At least during the 1950’s, most of such competitors who were interested in school business were offering their machines for sale to schools in the United States at prices below the school prices on comparable Singer machines. In fact, the Japanese ma *126 chines were being offered to the general public at approximately one-half the price of comparable Singer machines. By 1957-1958, there were over one million non-Singer family sewing machines being imported into the United States annually, of which approximately 90 percent were made in Japan.
60. As competition from the lower-priced Japanese machines increased during the 1950’s, more and more of the European machine dealers began to take on Japanese brands as well; and many shifted to Japanese brands entirely. Such trend has continued to the point where today virtually every dealer carrying European machines also carries at least one Japanese brand.
61. During 1954, most (if not all) of Singer’s principal competitors distributed their machines in the United States through local independent dealers; and they depended largely, if not entirely, upon the cooperation of such independent dealers for the sale of their machines to schools.
62. School purchases of European and Japanese machines usually involved undertakings on the part of the local dealers in such machines to service them after they were installed in the' schools. The school prices suggested by the national distributors of foreign machines, coupled with the service obligation incurred on school sales, greatly restricted the local dealers’ potential profit on school business. Many, if not most, of such local dealers were interested only in immediate profits, and were not impressed with any long-range future benefits which might arise out of the schools’ sewing programs or out of the schools’ use of their machines. Indeed, few, if any, of such local dealers could be sure of carrying the same brand machine, or even being in the same business, long enough to realize any of such possible future benefits. All of these factors doubtless affected the dealers’ interest in school business.
63. Unlike its principal competitors, plaintiff’s retail organization in the United States consisted entirely of its own employees who were subject to instructions from SSMCo’s executive offices on all phases and policies of its business, including its school assistance program and the servicing of Singer machines in the schools. Furthermore, Singer’s retail *127 shops throughout the United States during 1954, together with their service and repair facilities, had a far greater degree of permanency and continuity than the independent dealers through whom its principal competitors were then distributing their family sewing machines.
64. As early as 1950, plaintiff was furnishing at least 90 percent of all family sewing machines purchased by public and parochial schools in the United States.
65. Despite the increasing competition from European and Japanese machines in the United States since 1950 and despite the lower prices at which such machines were being offered to schools in the United States, at least during the 1950’s, plaintiff has continued up to the present time to furnish at least 90 percent of all family sewing machines purchased by public and parochial schools in the United States.
66. Notwithstanding the lower prices at which plaintiff’s principal competitors were offering their machines to schools, at least during the 1950’s, in 92.2 percent of the cases where contracts for the purchase of family sewing machines by public schools in the United States were awarded after publication of notice and/or invitation for competitive bids, specific models and/or exclusive features of Singer machines were specified as the standard for bidding.
67. The home economics teachers in the public and parochial schools of the United States have had considerable influence in the decision as to the type and brand of sewing machines purchased for use in their classrooms. Singer machines have been the overwhelming preference among such teachers, and such preference undoubtedly accounts for the percentage (92.2 percent) of cases involving competitive bidding and/or publication of notice in which Singer machines have been specified or described as the standard for bidding.
68. Despite the lower prices at which plaintiff’s principal competitors, at least during the 1950’s, were offering their family sewing machines to public schools in the United States, Singer was awarded 95.2 percent of all contracts for the purchase of machines by such schools which were awarded during such period (as well as all other relevant periods) after publication of notice and/or invitation for competitive bids.
*128 69. During all periods relevant to this case, where contracts for the purchase of family sewing machines by public schools in the United States were awarded after publication of notice and/or invitation for competitive bids, plaintiff was the only bidder for 80.5 percent of such contracts, and was awarded an additional 11.7 percent of such contracts despite lower bids by competitors.
70. The European-made Zig-Zag machines enjoyed a burst of popularity at the general public level in the United States during the early 1950’s, but the schools generally were not interested in such machines because they were too complex and delicate for classroom use.
71. Since at least 1952 or 1953 and up to the present time, some of Singer’s competitors have instituted their own school plans or school programs. (Necchi-Elna — prior to 1956; Viking — as early as 1952 or 1953 for other distributors and at least 1958 for the present distributor; White-Elna — 1964-1968; Bernina — about 1965; Pfaff — at least 1966.) In addition to discounts granted schools on their purchases of sewing machines, which will be described below, these other sewing machine companies also offer specially designed sewing cabinets, desks, and tables for the use of schools; aid or assist the schools in sewing room layouts; distribute brochures, pamphlets, charts, practice sheets, and other teaching aids for use of home economics teachers and their sewing students; advertise in educational journals; send representatives to, and prepare exhibits for, home economics teachers’ conventions; and sometimes send out home economics or other demonstrators to the schools. Because they lack its integrated distribution system, plaintiff’s competitors are unable to sustain as comprehensive an overall school program as it offers. This is particularly true in the areas of machine maintenance and service.
72. Many industries grant discounts to schools on their purchases of supplies. Companies such as Revere, General Electric, and Sunbeam advertise their discounts on their various products in the same educational publications in which Singer and other sewing machine companies advertise.
73. Although there is little or no profit on the sale of a sewing machine to a school, plaintiff and its competitors all *129 desire to do business with schools as an effective means to the end of creating the potential for future sales in the home sewing market.

Discounts to Charities Other than Schools

74. The 25-percent discount granted by plaintiff on Singer machines to charities (other than governments, schools, hospitals, and the Red Cross) included among the organizations listed in finding 16, above, was the minimum discount that plaintiff granted to charities generally on such machines in 1954.
75. Plaintiff’s policy of granting a minimum discount of 25 percent off list price on Singer machines to charities generally was established many years prior to 1954 and has been continued to date without change. None of these price discounts have been the subject of board consideration or approval, as in the case of the cash contributions referred to in finding 25, supra.
76. The 45-percent discount for non-profit hospitals, the Red Cross, and government agencies was first authorized by plaintiff on September 11, 1989, following the outbreak of World War II in Europe and the Declarations of War by England, France, and Canada; and such increased discount was continued for all such institutions without change until January 15, 1958, when it was reduced.
77. Because of World War II, plaintiff discontinued the production of sewing machines in June 1942, and did not resume the production of such machines until August 1945.
78. On December 16, 1947, and again on June 18, 1948, SSMCo advised all of its shops of its continuing policy of granting a basic charitable discount of 25 percent on Singer machines to charities generally and a 45-percent discount on such machines to the Red Cross, government and non-profit hospitals, and government agencies — despite the fact that there was a pent-up consumer demand and backlog of orders for family sewing machines following World War II which was not satisfied until 1949 or 1950.
79. On January 15, 1958, Singer again advised all of its shops of its continuing policy of granting a basic charitable discount of 25 percent to charities generally, and its then *130 38-percent discount to the Eed Cross, non-profit hospitals and government agencies on all Singer machines — despite the fact that there were not enough Singer Zig-Zag machines (introduced around May 1957) available to fill all of plaintiff’s orders therefor until October 1958.
80. The discounts to non-school charities were uniform throughout the United States, and were authorized and granted to each case without regard to location of the recipient charity or the type or quantity of machines involved.
81. The discounts granted by plaintiff on the Singer machines sold to non-school charities have always been granted without any strings attached, and without any expectation or understanding that such charities would do, or refrain from doing, any particular thing in return therefor.
82. The over-all profit to plaintiff’s Affiliated Group on SSMCo’s discount sales of Singer machines to the non-school charities in 1954 was small.
83. Few (if any) of plaintiff’s principal competitors after 1950 had any kind of policy or program which contemplated either regular cash contributions or the granting of discounts to any of the non-school charities.
84. The increased discount of 45 percent on Singer machines authorized by plaintiff for hospitals on September 11, 1939 was limited to non-profit hospitals because (i) plaintiff desired such increased discount (just like its basic charitable discount) to inure entirely to the benefit of the communities in which such hospitals were located and (ii) plaintiff had no desire to increase the profit margin of any hospital being operated for private profit.
85. Plaintiff continued its increased discount of 45 percent on Singer machines sold to the Red Cross, hospitals, and government agencies from 1953 through 1957 because of its regard for the emergency requirements and needs of such organizations growing out of the Korean War, and also because of its intention to make cash contributions to the Red Cross ranging from $125,000 to $135,000 in each of such years.
86. Plaintiff reduced its discount on Singer machines to the Red Cross, hospitals, and government agencies from 45 percent to 38 percent on January 15, 1958 because of its *131 belief that the Korean War emergency needs of such institutions had subsided and that conditions were returning to normal, and also because the SSMCo division was then aware of plaintiff’s intention to reduce its Red Cross cash contribution that year down to $8,500 from the $125,000 or $135,000 which plaintiff had been giving to that organization each year for the prior six years.
87. When plaintiff reduced its discounts on Singer machines to the Red Cross, hospitals, and government agencies from 45 percent to 38 percent on January 15, 1958, it was its intention gradually to reduce such discounts down to its basic charitable discount of 25 percent; but, instead of conditions becoming normal as it had believed in January 1958, the subsequent crises in Berlin, Laos, Cuba, and now Vietnam have caused plaintiff to feel morally obligated to continue such 38-percent discount to date.
88. Plaintiff has always regarded its Singer machine discounts to the non-school charities as the equivalent of property gifts or contributions to such charities, and, when solicited for outright contributions by such charities, have frequently responded by offering their established discounts to such charities in lieu of outright donations. In this regard it might be noted that, whereas an outright donation of cash or stock-in-trade would deplete the donor’s net worth, a sale of stock-in-trade at a break-even price would not.

Discoounts to Others

89. In addition to the discounts authorized for charities as described in paragraph 16, above, plaintiff extended the following discounts from list price on Singer machines to others during the year 1954:
(a) Employees of the Singer organization with more than six months’ service_ 30%
(b) Foreign diplomats- 20%
(c) Clothing manufacturers using plaintiff's industrial machines _ 15%
(d) Home economics (sewing) teachers- 20%
(e) Salaried county home demonstration agents and 4-H girls club leaders who devote entire time to extension service and need machines for use in their work (portable machines only)- 45%
(f) Army PX’s and Navy Ship Stores- 20%
*132 Approximately 4,055 Singer machines were sold to the above purchasers by SSMCo at the indicated discounts during the year 1954. Since none of these categories of purchasers are within the coverage of section 170(c) of the Revenue Code, plaintiff does not contend that it is entitled to any federal tax deduction for the discounts extended to them.
90. The 30-percent employee discount represented a fringe benefit of the type usually granted by business organizations to their own employees. In addition, plaintiff believed that such discount would encourage its sales personnel to buy machines of their own, and, through home practice, become more familiar with Singer machines and more effective in their sales presentations with respect thereto.
91. The 20-percent discount to diplomats was granted merely as a courtesy to maintain friendly relations with official representatives of the 180 foreign countries in which plaintiff has been doing business.
92. The 15-percent discount to clothing manufacturers was granted merely as a courtesy to maintain the good will of customers using plaintiff’s industrial machines.
93. The 20-percent discount to home economics (sewing) teachers was granted to gain their good will and to encourage them to have sewing machines at home so that, through home practice, they would become better sewing teachers and thereby increase student interest in learning home sewing.
94. The 45-percent discount on portable machines to county home demonstration agents and 4-H girl club leaders was granted for essentially the same reasons as obtained in the case of the home economics teachers, described in the preceding paragraph.
95. The 20-percent discount to the Army PX’s and Navy Ship Stores was granted in order to permit these organizations to sell plaintiff’s machines at competitive prices and still realize a reasonable mark-up.
Ultimate FINDINGS
96. The 45-percent school discounts involved in this suit were not granted by plaintiff out of a purely donative spirit. Such discounts were, however, offered voluntarily in the sense that they were not the product of any form of con *133 straint or compulsion, contractual or otherwise, exerted on Singer, nor were they induced by its anticipation ox any consequential direct or immediate economic benefit.
97. The evidence as a whole shows that the merchandise discounts were offered to public and parochial schools for the predominant purpose of encouraging those institutions to interest and train young women in the art of machine sewing; thereby enlarging the future potential market by developing prospective purchasers of home sewing machines and, more particularly, Singer machines — the brand on which the future buyers learned to sew.
98. The evidence shows that the merchandise discounts granted the charitable, religious and governmental organizations, referred to in findings 18, 74-76 and 80-88, were not significantly motivated by commercial considerations of anticipated direct or indirect economic benefit to plaintiff. Instead, it appears that the primary purpose of such discounts was to assist the recipient organizations in the performance of the charitable, religious or public services that they were currently providing. The incidental effect of this policy was the development and maintenance of a favorable public image for plaintiff in the eyes of those organizations and their members.
CONCLUSION OK LAW
Based upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover to the extent indicated in the opinion, and judgment is entered to that effect, with the exact amount of recovery to be determined in further proceedings pursuant to Rule 131(c) of the Rules of the court.

 We are Indebted to Trial Commissioner George Willi for his findings of fact, which have been adopted in nearly their entirety and have made the writing of this opinion considerably easier.

 All citations to Code sections hereinafter are, unless otherwise indicated, in reference to the Internal Revenue Code of 1954.

 “Sec. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.
“ (a) Allowance of Deduction.—
“(1) General rule. — There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate.”

 The parties have stipulated that those organizations listed above in categories (e) through (i) are the type that are described in section 170(c) and thereby qualify as charitable organizations for purposes of section 170(a).

 Defendant points out in its brief that the findings from which these figures were taken do not show the total discounts but instead represent the total discounts allowable by section 170(b) (2) which limits a corporation's total charitable deductions to a figure not to exceed five percent of the taxpayer’s taxable income.

 The following income tax deficiencies with respect to the year 1964 and the following amounts of interest thereon were paid by plaintiff:
January 31, 1961.... Tax...$1,100,000.00
February 28, 1961. Tax. 398,861.80
May 16, 1961. Interest. 630,341.45
February 13, 1962_ Tax_ 16,123.17
February 13,1962. Interest.. 3,623.10

 “ (b) Limitations—
“(2) Corporations. — -In the ease of a corporation, the total deductions under subsection (a) for any taxable year shall not exceed 5 percent of the taxpayer’s taxable income * * *."

 It should be pointed out that the type of problem hereinafter discussed Is limited to those years prior to the Tax Reform Act of 1969, Public Law 91-172, § 201(a), which added the following subsection (e) to section 170 of the 1954 Code:
“(e) CERTAIN CONTRIBUTIONS OP ORDINARY INCOME AND CAPITAL GAIN PROPERTY.—
“(1) General Rule. — The amount of any charitable contribution of property otherwise taken Into account under this section shall be reduced by the sum of—
“(A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution), * *
For an informative discussion of the effects of this new section, together with its relation to section 1011(b), added by section 201(f)(2) of Public Law 91-172, supra, see, Taggart, The Charitable Deduction, 26 Tax L. Rev. 63 (1970).

 “(a) General Rule. — Gross Income does not Include the value of property acquired by gift, bequest, devise, or Inheritance.”

 Section 162(b) provides:
“Charitable Contributions and Gifts Excepted. — No deduction shall be allowed under subsection (a) for any contribution or gift which would be allowable as a deduction under section 170 were It not for the percentage limitations, the dollar limitations, or the requirements as to the time of payment, set forth In such section.”

 It should be explained that plaintiff, In this action, does not claim a business expense deduction under I.R.C. section 162(a) and consequently Tve do not pass on that question.

 The staff of tie vice president in charge of the united States family-sewing machine department consisted of the following: a director of service and supply (who placed orders with the factories, arranged distributions to field warehouses, and established allocations of sewing machines where necessary) ; a secretary-treasurer (with a staff consisting of a general auditor and other auditors, and an assistant secretary-treasurer) ; a director of sales promotion; a director of advertising; and an educational department director. Each of these persons had various staff assistants and subordinates working *112 under his direction. Immediately below the vice president were four assistant vice presidents, each of whom was responsible for a geographic sector of the united States, under each such assistant vice president were 7 or 8 regional sales offices called central agencies, each responsible for a specified geographic portion of that sector, and each headed by a general agent, under each general agent were an office manager, a number of accounting personnel, and a group of field auditors, one or two sales supervisors, and 6 to 10 district managers. The sales supervisors actively supervised and assisted the district managers, under each district manager were 6 to 10 sewing centers.

 The follo-wing income tax deficiencies with respect to the year 1954 and the following amounts of interest thereon were paid by plaintiff:
January 81, 1961_ Tax _$1,100, 000.00
February 28, 1961_ Tax _ 398, 861. 80
May 15, 1961_ Interest_ 530, 341.45
February 13, 1962_ Tax _ 15,123.17
February 13, 1962_ Interest_ 3, 623.10
The payment of tax and interest on February 13, 1962, was effected through the allowance of a credit for a portion of certain over-assessments with interest theretofore determined by the Commissioner to be due and payable to the taxpayer for the years 1950 and 1951. All of such payments were covered into the united States Treasury as internal revenue taxes in the usual course of business by the District Director.

 From June 9, 1933 until October 1957, the school discount rate was generally 45 percent, although occasionally special net “school prices” were quoted on specific models and at one time schools received only a 25-percent discount on some models. Beginning in October 1957, the school prices were no longer published in the regular company price list schedules, but were published in a separate listing for use by the district managers and sewing center managers principally. Thereafter, school prices were listed as net prices — some slightly more and some slightly less than 45 percent — but in most instances something closely approximating a 45-percent discount.

 Even when the method of pricing school machines was changed In 1957 (finding 35 and footnote 3 above), a responsible Singer official took that occasion to point out to the field organization generally and to the sewing center managers specifically that the company hoped the new school-price schedule would enable them “to obtain more school business.”