ARCHBISHOP SAMUEL TRUST, CHARLES MANOOG, TRUSTEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ATHANASIUS Y. SAMUEL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 79946, 79947. Filed June 30, 1961.

*George B. Lourie, Esq.*, for the petitioner.

*Raymond T. Mahon, Esq.*, for the respondent.

SCOTT, *Judge:* The respondent determined deficiencies in income tax against Archbishop Samuel Trust in the amounts of $61,879.74, $818.86, and $239.14 for the years 1954, 1955, and 1956, respectively, and an addition to the tax under section 6653(a) of the Internal Revenue Code of 1954 in the amount of $3,093.99 for the year 1954. The respondent also determined deficiencies of $61,818.33 and $157.64 for the years 1954 and 1955 in the income tax of petitioner Athanasius Y. Samuel and additions to the tax for 1954 under sections 294(d) (1)(A) and 294(d)(2) of the Internal Revenue Code of 1939 and section 6653(a) of the Internal Revenue Code of 1954 in the amounts of $5,563.65, $3,709.10, and $3,090.92, respectively.

Some of the issues raised by the pleadings have been disposed of by agreement between the parties, leaving for our decision the following:

(1) Whether the transfer by Athanasius Y. Samuel of the Dead Sea Scrolls to the Archbishop Samuel Trust constituted a sale of the scrolls to the trust in return for annuity payments as contended by petitioners or a transfer to the trust with provision for trust distributions to a beneficiary as determined by respondent.

(2) Whether the gain on the sale of the Dead Sea Scrolls in 1954 represented a long-term capital gain of the Archbishop Samuel Trust or of Athanasius Y. Samuel as the grantor treated as the owner, respondent having made inconsistent determination in the two deficiency notices taxing this long-term capital gain to each petitioner.

(3) If the capital gain from the sale of the Dead Sea Scrolls is that of the Archbishop Samuel Trust, whether this petitioner is a tax-exempt charitable organization as contended by petitioner.

(4) Whether respondent failed to include in his determination of the basis of the Dead Sea Scrolls for the purpose of computing the gain on the sale thereof all the cost of acquisition of the scrolls.

FINDINGS OF FACT.

Petitioner Archbishop Samuel Trust is a trust with its principal office at 9 Piedmont Street, Worcester, Massachusetts. The fiduciary income tax returns of the Archbishop Samuel Trust (hereinafter referred to as the trust) for the years 1954, 1955, and 1956 were filed with the district director of internal revenue for the district of Massachusetts.

Petitioner Athanasius Y. Samuel, an archbishop and head of the Syrian Church of Antioch in the United States and Canada (hereinafter referred to as Samuel) is an individual with residence at 293 Hamilton Place, Hackensack, New Jersey. Samuel's income tax returns for the years 1954 and 1955 were filed with the district director of internal revenue at Newark, New Jersey.

The Syrian Church of Antioch is one of the oldest of the Christian churches and at present has about a million believers, and 800 churches in Syria, Palestine, Turkey, Egypt, Iraq, North America, South America, and India.

Samuel discovered the Dead Sea Scrolls through Bedouin tribesmen and other persons. He brought the scrolls to the United States about January 29, 1949. The scrolls were thereafter placed on display in various parts of the country, including the Library of Congress at Washington, D.C., Duke University of Durham, North Carolina, the University of Chicago at Chicago, Illinois, and the Worcester Art Museum at Worcester, Massachusetts.

On November 30, 1951, Samuel transferred the Dead Sea Scrolls to the trust. The trust instrument provided in part as follows:

I, ATHANASIUS YESHUE SAMUEL, ARCHBISHOP, THE METROPOLITAN OF JERUSALEM AND TRANSJORDAN, of West New York, New Jersey (hereinafter called the "settlor"), hereby transfer the so-called "Dead Sea Scrolls" * * * to the settlor and Charles Manoog of Worcester, Massachusetts, (hereinafter called the "trustees"), and at the request of the settlor, the trustees agree to hold said property and all additions thereto, in trust, as follows:

\*      \*      \*      \*      \*      \*      \*

SECOND: During the settlor's lifetime the net income and 90% of the principal shall be disposed of as he directs in writing from time to time. Any net income not thus disposed of shall be added to principal at the end of each calendar year, and any principal not thus disposed of at the time of the settlor's death shall be added to principal.

THIRD: On death of the settlor, the remaining trust property shall be disposed of as follows:

(a) The trustees shall pay to the settlor's mother, Khatoun Malkey Samuel, of Homs, Syria, during her lifetime such sum of money monthly if possible, as in their uncontrolled discretion will be sufficient for her care, maintenance and support in the style she is now accustomed to, but not more than $2500. a year, such sum to be paid out of income, if there is income, otherwise out of principal if at the time principal consists of something other than the Dead Sea Scrolls;

(b) The trustees shall use income or principal in their uncontrolled discretion for any or all of the following purposes, viz.:

(i) to establish scholarships at educational institutions not run for profit to be used to pay for further education of Syrian Orthodox monks and priests or for education of other worthy Syrian Orthodox persons;

(ii) to provide capital funds or operating expenses for St. Mark's Monastery in Jerusalem;

(iii) to help Syrian Theological students, particularly those studying to become priests or monks in the Syriac Orthodox of Antioch faith, and

(iv) to print for free distribution Syriac Orthodox of Antioch faith liturgy, religious, historical and Syriac school books;

provided however, that the trustees shall not use either income or principal for the purposes of paragraph Third (b) unless at the time of such use or setting aside for such use the trustees are reasonably satisfied that the remaining assets of the trust are reasonably sufficient to enable full compliance with paragraph Third (a).

\*      \*      \*      \*      \*      \*      \*

*FIFTH:* The settlor shall have the right at any time or times by a writing, or writings, signed by the settlor, to amend this trust so as to reduce the amount of income or principal to which he has become entitled and to make any other amendment thereof and to revoke the same.

The trust instrument further provided for broad powers to the trustees to deal with the trust corpus, initially the Dead Sea Scrolls, either to retain the scrolls or sell them, to buy, hold, sell, exchange, and lease all types of real and personal property, and to allocate to income and capital all trust receipts and trust expenditures.

On October 7, 1952, the trust was amended. The instrument of amendment provided in part as follows:

I, ATHANASIUS YESHUE SAMUEL, Archbishop, The Metropolitan of Jerusalem and Transjordan, of West New York, New Jersey, (hereinafter called the "Settlor") hereby amend the Archbishop Samuel Trust, created by me by instrument dated November 30, 1951 (* * *), by substituting the following articles bearing the same numbers for the same numbered articles in said Trust, so that said articles, as amended, shall read as follows:

*SECOND:* During the Settlor's lifetime, the sum of Fifteen Thousand (15,000) Dollars to reimburse the Settlor for the cost to him of said Scrolls and an additional Fifteen Thousand (15,000) Dollars for his expected future expenses in connection therewith shall be paid to the Settlor as he directs in writing from time to time. In addition, the sum of Ten Thousand (10,000) Dollars each year, payable from income or principal, as determined by the trustees, shall be paid to the Settlor each year. Upon the death of the Settlor, the trustees shall pay to the Settlor's mother, Khatoun Malkey Samuel, of Homs, Syria, during her lifetime, such sum of money, monthly if possible, as in their uncontrolled discretion shall be sufficient for her care, maintenance and support in the style she is now accustomed to, but not more than Twenty-five Hundred (2500) Dollars a year, such sum to be paid out of income, if there is income, otherwise out of principal if at the time principal consists of something other than the Dead Sea Scrolls.

*THIRD:* The Trustees shall use such sums of income and principal as are not paid in any year for the foregoing purposes, and subject to a reserve of such amount as is reasonable and necessary to pay to the Settlor's mother the sums specified in Article SECOND for the probable term of her life, for such religious, charitable, scientific, literary or educational purposes as they shall determine, from time to time, adding to the principal any sums not so used at the end of each year, provided that no part of the net earnings thereon shall inure to the benefit of the Settlor or any private individual and no substantial part of the activities of the Trust shall be for carrying on propaganda, or otherwise attempting, to influence legislation. To the extent that the following purposes may be carried out in accordance with law and in such manner as to safeguard the status of the income and principal disposed of by this Article as being that of a charitable trust under the Internal Revenue Code of the United States, the trustees shall use income and principal in their uncontrolled discretion for any or all of the following purposes:

(a) to establish scholarships at educational institutions not run for profit to be used to pay for further education of Syrian Orthodox monks and priests or for education of other worthy Syrian Orthodox persons;

(b) to provide capital funds or operating expenses for St. Mark's Monastery in Jerusalem;

(c) to help Syrian Theological students, particularly those studying to become priests or monks in the Syriac Orthodox of Antioch faith; and

(d) to print for free distribution Syriac Orthodox of Antioch faith liturgy, religious, historical and Syriac school books.

\*     \*     \*     \*     \*     \*     \*

*FIFTH:* The Settlor shall have the right at any time or times, by a writing or writings, signed by the Settlor, to amend this Trust so as to reduce the amount of income or principal to which he or his said mother has become entitled. The disinterested trustee, or trustees, may make such amendments thereof as may be necessary to obtain and maintain the qualification of this Trust as a charitable trust under the provisions of the Internal Revenue Code of the United States, from time to time in effect, and all provisions of this Trust shall be construed in such manner as to obtain and maintain said qualifications for this Trust except as to the amounts reserved for payment to the Settlor and his said mother under the provisions of Article SECOND hereof.

On July 1, 1954, the Dead Sea Scrolls were sold by the trust for a gross sales price of $250,000. The proceeds of the sale for the most part were invested in stocks, bonds, and Treasury notes.

There was no distribution made from the trust to Samuel for the year 1951. During the years 1952 and 1953 Samuel did not receive from the trust the $10,000 annual payments to which he was entitled under the amended trust agreement. Payments in the amount of $10,000 were made to Samuel for each of the years 1955 and 1956. In the year 1954, Samuel did not receive the annual $10,000 payment from the trust but did receive two $15,000 payments to reimburse him for his expenses in connection with the Dead Sea Scrolls.

The trust had no income for the years 1951, 1952, 1953, and the first half of 1954 prior to the sale of the scrolls on July 1, 1954. On its fiduciary income tax return for 1954, the trust reported income of $3,794.37 and various expenses totaling $1,043.10. On its fiduciary income tax return for 1955, the trust reported income of $8,541.75 and various expenses totaling $145.95. On its fiduciary income tax return for 1956, the trust reported income of $10,315.32 and various expenses totaling $1,269.50.

The trust made the following payments to the named individuals on the dates and for the services indicated:

| Name | Amount | Date of authorization | Service for which payment was made |
|---|---|---|---|
| Michael Abodeely | $550.00 | July 2, 1954 | Attorney's fees for sale of scrolls. |
| Takhman, Garabed | | | |
| Sara Albert | 400.00 | July 9, 1954 | Care and preservation of scrolls. |
| Lydia Albert | | | |
| Alphonse Chourise | | | |
| George B. Kedersha | 2,500.00 | Aug. 28, 1954 | Attorney's fees before sale of scrolls. |
| Charles Manoog | 550.00 | Nov. 15, 1954 | Display cases for scrolls. |
| David Lazar | 1,500.00 | Dec. 2, 1954 | Campaign to obtain customers for scrolls. |
| George Garabed | 125.00 | Mar. 31, 1955 | Attempts to sell scrolls. |
| Carl Wertz | 365.85 | ¹June 27, 1956 | Attempts to sell scrolls. |

¹Earlier bill for greater amount contested. Payment delayed thereby.

Payments were also made by the trust as follows:

| Name | Amount | Date of authorization | Service for which payment was made |
|---|---|---|---|
| George S. Shamoun | $4,000 | Aug. 15, 1957 | Settlement of claim for assistance in Samuel's acquisition of scrolls. |
| Khalil K. Shahin | 4,000 | Aug. 15, 1957 | |
| Moosa and Dumas | 150 | May 27, 1958 | Legal expenses in connection with Shamoun's and Shahin's claim for settlement. |
| Sibley, Blair and Mountain. | 160 | May 27, 1958 | |

Shamoun and Shahin assisted Samuel in acquiring the scrolls by notifying him of their availability and by acting as intermediaries between the owners of the scrolls and Samuel. In March 1954, Shamoun, acting either on his own behalf or on behalf of Shahin and himself, demanded between $25,000 and $50,000 for the services rendered to Samuel in the purchase of the scrolls. After negotiations the claim was settled by the trust's making a $4,000 payment to each of the claimants and also paying the $150 legal fee to Moosa and Dumas incurred by the claimants during the negotiations. The $160 payment to Sibley, Blair, and Mountain was for legal fees incurred by the trust during the course of the negotiations.

A resolution of the trustees of the trust, made at a meeting held August 15, 1957, provided:

Upon motion duly made and seconded, it was voted:

To pay the sum of one dollar ($1.00) to George Shaya Shamoun, of Jerusalem, Jordan, and Khalil Kando Shahin, of Bethlehem, Jordan, for a release of all claims against Archbishop Athanasius Yeshue Samuel and Charles Manoog as trustees of the Archbishop Samuel Trust dated November 30, 1951, as amended.

To pay the sum of four thousand dollars ($4,000.00) to George Shaya Shamoun for his own benefit as a gift and not as compensation, and to pay the sum of four thousand dollard [sic] ($4,000.00) to George Shaya Shamoun as trustee for the benefit of Khalil Kando Shahin of Bethlehem, Jordan, as a gift and not as compensation, both gifts being in gratitude for the unsolicited helpfulness of these people in obtaining the Dead Sea Scrolls for the Archbishop Samuel Trust.

Check Nos. 254 through 261 were used for this purpose.

At all times here in issue Charles Manoog and Samuel were the only trustees of the trust. Manoog had no financial or personal interest in the trust.

Samuel was 47 years old in 1954 and his mother Khatoun Malkey Samuel was 65 years old in 1954.

The cost of a fixed dollar annuity for a male age 47 of $10,000 per year for life, and in the event of his death a reduced annuity of $2,500 per year for his mother, a female age 65, for her life, according to Table I in section 1.72–9, Income Tax Regs., is $177,161.63.

The cost of a fixed dollar annuity for a male age 47 of $10,000 per year for life, according to Table I in section 1.72–9, Income Tax Regs., is $172,853.66.

The cost of a fixed dollar annuity in 1954 for a male age 47 of $10,000 per year for life, according to the rates of the Massachusetts Mutual Life Insurance Company was $202,174.

The computed cost based on the rates of the Massachusetts Mutual Life Insurance Company of a fixed dollar annuity in 1954 for a male age 47 of $10,000 a year for life, and in the event of his death a reduced annuity of $2,500 for a female age 65 for her life, was $206,000.

The life expectancy of a male age 47 used by the Massachusetts Mutual Life Insurance Company in 1954 in its determination of annuity costs was 28.78 years.

Respondent in his determination of deficiency has increased the income of both the trust and Samuel in the year 1954 by $123,652.25 as capital gain from the sale of the Dead Sea Scrolls. Respondent in both deficiency notices computed the capital gain as follows:

| | | |
|---|---:|---:|
| Proceeds from sale of Dead Sea Scrolls | | $250,000.00 |
| Less: Cost (50 English pounds) | $170.00 | |
| Legal expense (adjustment to (a) above) | 450.00 | |
| Travel expense (adjustment to (a) above) | 575.50 | |
| Advertising | 1,500.00 | 2,695.50 |
| Distributable net long-term capital gain | | 247,304.50 |
| Less: 50 percent reduction provided by section 1202 of the 1954 Internal Revenue Code | | 123,652.25 |
| Capital gain to be taken into account | | 123,652.25 |

Respondent disallowed the deductions claimed by the trust on its fiduciary return for 1954 of legal expense of $450 and travel expenses of $575.50 which he considered as part of the cost of the scrolls, such adjustment resulting in $857.92 of ordinary income to the trust instead of a loss of $167.58 (after a charitable deduction of $2,918.85) as reported on its return. Respondent included this $857.92 amount in the income of the trust and also in the income of Samuel as determined by him. The explanation of the determination in the notice of deficiency to Samuel was that the trust was revocable or in the alternative that the income therefrom was for the benefit of the grantor and that the grantor reserved rights to control the enjoyment of the income of the trust. For the year 1955 respondent disallowed the deduction of $10,000 claimed by the trust on its fiduciary return as a distribution to the settlor with the explanation that such amount did not constitute an allowable deduction. For the year 1955 respondent in his notice of deficiency to Samuel determined that all income of the trust was taxable to Samuel with the same explanation as made for the year 1954.

For the year 1956 respondent disallowed the deduction of $10,000 claimed by the trust on its fiduciary return with the same explanation for this disallowance as given in 1955.

The entire income of the trust could be distributed to or held or accumulated for future distribution to Samuel without the approval or consent of an adverse party.

The cost of the Dead Sea Scrolls to be used in determining the gain on the sale thereof includes in addition to the amount determined by respondent, the amount of $4,000 consisting of the payment made on July 2, 1954, of $550 to Michael Abodeely, the payment made on July 9, 1954, of $400 to Sara Albert and others, the payment made on August 28, 1954, in the amount of $2,500 to George B. Kedersha for attorney's fees for services rendered before the sale of the scrolls and the payment in the amount of $550 to Charles Manoog for a display case for the scrolls.

Some of the facts have been stipulated and are found accordingly.

## OPINION.

The facts in this case show that Samuel on November 30, 1951, transferred the Dead Sea Scrolls in trust reserving to himself the net income of the trust and 90 percent of the principal. By an amendment to the trust dated October 7, 1952, when the scrolls were already a part of trust corpus, Samuel relinquished his right to the trust income and 90 percent of the principal and instead reserved $30,000 to reimburse him for the cost of the Dead Sea Scrolls and for expected future expenses in connection therewith, $10,000 payments to be made to him from income or principal annually for his life, and payments to his mother for her support in amounts deemed necessary by the trustees but not to exceed $2,500 a year for her life should he predecease her.

The petitioners view the creation of the trust in 1951, the transfer of the scrolls to the trust, and the amendment to the trust in 1952 whereby annual payments of $10,000 were to be made to Samuel for his life and payments in a lesser amount to Samuel's mother for her life, if she survived him, all as one transaction and characterize it as a sale of the scrolls by Samuel to the trust in return for an annuity. Samuel argues that each $10,000 payment would be taxable to him under the rules applicable to annuities with part of the $10,000 payment taxable as a capital gain and the balance as interest income. The petitioners argue that the trust qualifies for exemption from taxation under sections 501–513 of the Internal Revenue Code of 1954 and, therefore, the gain realized by the trust on the sale of the scrolls and all other income realized by the trust would be tax exempt. In the alternative, should it be determined that the trust is not tax

exempt, petitioners contend that the trust is entitled to a basis for the scrolls of an amount equal to the computed cost of the annuity to Samuel plus an additional $44,300.85 amount representing payments by the trust for expenses incurred in the acquisition, maintenance, and sale of the scrolls.

The respondent on the other hand has viewed the creation of the original trust in 1951 and the amendment thereto in 1952 as a trust arrangement with Samuel, as settlor, retaining the right to $10,000 annual payments, instead of as a sale of the scrolls for an annuity. Respondent also argues that the trust is a so-called "grantor trust" under the provisions of section 674(a) or 677(a) of the Internal Revenue Code of 1954,[1] so that all the income of the trust is taxable to Samuel. As an alternative to this position, the respondent contends that the trust is not a tax-exempt organization within the meaning of section 501(c) of the Internal Revenue Code of 1954.

In dealing with the first issue whether the transfer of the scrolls to the trusts constituted a sale for an annuity we must consider the facts as they happened and not as they could have happened. The instrument dated November 30, 1951, very obviously created a trust. By the instrument the scrolls were transferred by Samuel, called the "settlor," to the settlor and Charles Manoog, the "trustees," and the trustees agreed to hold such property and all additions thereto "in trust." Samuel by this instrument reserved the right to dispose of all the income of the trust and 90 percent of the principal. On October 7, 1952, 10 months after the original transfer of the scrolls to the trust, Samuel amended the trust relinquishing his right to all the income and 90 percent of the principal and instead reserving annual payments of $10,000 to be paid from either income or principal.

It is quite clear that Samuel created a trust with the scrolls first reserving all the income and later amending the trust, reserving instead a fixed amount yearly. In the usual annuity situation the annuitant transfers assets to an obligor in return for the obligor's undertaking to make fixed payments to the annuitant. See *Estate of*

---

[1] SEC. 674. POWER TO CONTROL BENEFICIAL ENJOYMENT.

(a) GENERAL RULE.—The grantor shall be treated as the owner of any portion of a trust in respect of which the beneficial enjoyment of the corpus or the income therefrom is subject to a power of disposition, exercisable by the grantor or a nonadverse party, or both, without the approval or consent of any adverse party.

SEC. 677. INCOME FOR BENEFIT OF GRANTOR.

(a) GENERAL RULE.—The grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be—

    (1) distributed to the grantor;

    (2) held or accumulated for future distribution to the grantor; or

    (3) applied to the payment of premiums on policies of insurance on the life of the grantor (except policies of insurance irrevocably payable for a purpose specified in section 170(c) (relating to definition of charitable contributions)).

*Sarah A. Bergan,* 1 T.C. 543 (1943). In the present case there was no transfer of any asset in return for an obligation to make fixed payments. The scrolls, which constituted the corpus of the trust, had already been transferred to the trustees in trust. All Samuel did was to amend the trust so as to receive a fixed annual amount in lieu of the income of the trust. We do not feel that by this amendment to the trust Samuel converted what was a settlor-trust relationship into an annuitant-obligor relationship.

In support of their position the petitioners cite *Estate of Maria Becklenberg,* 273 F. 2d 297, reversing 31 T.C. 402. In that case the petitioner's decedent in 1934 with two others transferred assets to a revocable trust. In 1938 that trust was revoked and the assets were transferred to a new trust. Under the 1938 trust agreement the trustees were directed to liquidate the assets and, among other things, to purchase an annuity for the decedent paying $10,000 annually and, until the annuity was purchased, the trustees were to pay the decedent $10,000 annually out of the trust. The Court of Appeals held that no part of the trust corpus was includible in the decedent's estate as property transferred with income therefrom retained for life under section 811(c)(1)(B) of the 1939 Code. The court held that decedent retained a right to receive $10,000 annually for her life by way of annuity or by distribution from the trust and that at her death, there was nothing left to be included in her gross estate.

In the *Becklenberg* case the earlier trust had been revoked and the assets transferred to a new trust in return for the trustees' undertaking to provide the annuity. In the present case the earlier trust was not revoked but was only amended. There was no new transfer of the trust assets, the Dead Sea Scrolls, in return for an annuity obligation.

The respondent has taxed the trust income to Samuel for the years 1954 and 1955 upon the ground that the trust is a grantor trust within the provisions of sections 674(a) and 677(a) of the Internal Revenue Code of 1954. The income taxed to Samuel includes an amount of $123,652.25, one-half of the $247,304.50 determined by respondent to be the net long-term capital gain upon the sale of the scrolls by the trust in 1954.

Section 677(a) of the Internal Revenue Code of 1954 provides that the grantor shall be treated as the owner of any portion of the trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be—

(1) distributed to the grantor,

(2) held or accumulated for future distribution to the grantor, or

(3) applied to the payment of premiums on policies of insurance on the life of the grantor * * *

Under the trust, as amended, Samuel reserved to himself annual payments of $10,000 to be made from either principal or income as the trustees should choose. The trustees were Samuel, himself, and Charles Manoog who was not an adverse party within the meaning of section 677(a).

The respondent contends that it makes no difference whether State law would treat the capital gain on the sale of the scrolls as income or corpus for trust accounting purposes, for in either case, as long as Samuel had the right to $10,000 either from trust income or principal, it is clear that the capital gain may be accumulated for future distribution to Samuel during any year in which the income of the trust is less than $10,000. In support of his position, the respondent cites *Greenough* v. *Commissioner*, 74 F. 2d 25 (C.A. 1, 1934); *Helvering* v. *Evans*, 126 F. 2d 270 (C.A. 3, 1942), affirming 42 B.T.A. 851 (1940) ; and *Kent* v. *Rothenseis*, 120 F. 2d 476 (C.A. 3, 1941).

In the cases cited by respondent the settlors of the trusts had reserved either a present, future, or contingent right extending to all the accumulated earnings of the trusts therein involved. In the present case, Samuel's right to accumulated earnings is limited to $10,000 a year plus a $30,000 amount to be paid him as reimbursement for expenses. There is no question that Samuel's right to receive $10,000 a year out of trust income would make him taxable on trust income in that amount, assuming the trust had $10,000 of current income, even though Samuel was paid out of principal for that particular year. The more difficult question is whether the $247,304.50 amount determined by respondent as being the capital gain on the sale of the scrolls in 1954 or such amount of gain as may be determined herein is, within the meaning of section 677(a)(2), being held or accumulated for future distribution to the grantor so as to be taxable to the grantor. And if only a portion of the gain is being accumulated for future distribution to the grantor, a determination of that portion is necessary.

We feel that all of the gain on the sale of the scrolls is being accumulated for future distribution to the grantor. The trust received $250,000 upon the sale of the scrolls. This amount less the expenses of the sale constituted the corpus of the trust. By the amended trust indenture Samuel was to and, in fact, did receive $30,000 of this amount as reimbursement for expenses. With the remaining corpus the trust had to meet its $10,000 annual obligation to Samuel. The cost of a fixed dollar annuity in 1954 for a male age 47 of $10,000 per year for life, according to the rates of the Massachusetts Mutual Life Insurance Company would have been $202,174 and with a lesser an-

nuity reserved to a woman age 65, approximately $206,000. Generally, this means, assuming a normal life span for Samuel, that it would take $202,174 together with some income therefrom to meet an obligation such as was incurred by the trust. The annuity rates used by the Massachusetts Mutual Life Insurance Company in 1954 were based on a life expectancy of a male age 47 of 28.78 years. Obviously the life expectancy at which costs of annuities are computed are the average. Nevertheless, considered on this basis the entire capital gain of the trust could be considered to be accumulated for future distribution to Samuel. But more important is the fact that there is no guarantee that the trust will produce income in any amount in any year. Broad powers of investment or reinvestment of the trust funds in incorporated or unincorporated enterprises (even though, absent the authority given by the instrument, such investments would be of a character not approved for trust funds) are given to the trustees. The trustees are Samuel, himself, and a nonadverse party. Should the investments of the trust funds be such as to produce little income, the entire amount received for the scrolls could be paid out to Samuel within a period of less than 22 years. Furthermore, all the $10,000 payments out of the trust could be made exclusively from the principal of the trust notwithstanding the fact that the trust had substantial income. Considering all these factors we think it clear that the proceeds from the sale of the scrolls were held in their entirety for future distribution to Samuel.

Having decided that Samuel reserved a life interest in the trust to the extent of $10,000 a year to be paid from principal or income and that because of this reservation the trust is a "grantor trust" within the provisions of section 677, it is unnecessary to discuss respondent's alternative arguments that the trust does not qualify as a tax-exempt organization within the meaning of section 501(c) of the Internal Revenue Code of 1954 or that the trust is not entitled to a charitable deduction under section 642(c) of the Internal Revenue Code of 1954 because no part of the trust income has been permanently set aside for charity.

There still remains the question of the proper basis for the scrolls for computing the amount of gain upon the sale thereof. The petitioners argue that the basis of the scrolls to the trust would be an amount equal to the computed cost of an annuity which would pay a 47-year old male $10,000 a year for life plus an amount of $44,300.85 representing payments by the trust for expenses incurred in the acquisition, maintenance, and sale of the scrolls.

Our holding above that Samuel had not purchased a private annuity from the trust disposes of the argument that the trust is entitled to an amount equal to the computed cost of an annuity as a basis

for the scrolls. The record does show, however, that the trust did make expenditures of $44,300.85 all of which except $1,500 are for items differing from those included by respondent in computing the cost of the scrolls and $34,000 of which was paid out in the year 1954. Thirty thousand dollars of the $34,000 expended in 1954 constituted a payment to Samuel to reimburse him for his costs with respect to acquiring the scrolls and expected future expenses in connection therewith. There is no showing in the record what these expenses were for which Samuel was to receive reimbursement or whether they were in fact incurred. The respondent allowed a cost of $170 for the scrolls. We feel that the record is lacking in evidence to justify considering the $30,000 paid to Samuel as a part of the cost of the scrolls. There is no showing that Samuel incurred expenses or the amount of such expenses, if any, that could constitute a basis to him for the scrolls which basis would have been transferred to the trust when the scrolls were placed in trust. The trust also made payments to others in the amount of $14,300.85. These payments were for expenses incurred in the acquisition, maintenance, and sale of the scrolls. A total of $5,500 of the amount was paid in 1954 and of this $5,500 amount, $1,500 has apparently been allowed by respondent as a part of the basis of the scrolls under the designation of advertising. The remaining $4,000 paid out in 1954 constitutes capital expenditures attributable to the scrolls and may be added to the basis for the scrolls in determining the gain on the sale thereof.

Respondent does not contend that any of the expenses other than the two $4,000 payments made to George Shamoun and Khalil Shahin claimed to have been incurred by the trust in connection with the scrolls were not necessary expenses as claimed. The respondent argues that it is clear from the resolution of the trustees authorizing the two $4,000 payments that they were gratuitous and, therefore, not deductible. This we need not decide since the payments were made in 1957, a year not before us and the record contains no evidence showing that either the trust or Samuel kept records or reported income other than on the cash basis. Cf. *Roberta Pittman*, 14 T.C. 449 (1950). The payment of $125 made in 1955 for services previously rendered in attempting to sell the scrolls and the payment made in 1956 in the amount of $365.85 for the same purpose are deductible expenses of the trust in the respective years in which the payments were made.

Since we agree with respondent that all the trust income is taxable to Samuel, we hold that there is no income in any of the years 1954, 1955, and 1956 taxable to the trust.

*Decisions will be entered under Rule 50.*