IRVING I. RUSOFF AND PERLE P. RUSOFF, ET AL., [1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 682-72, 1358-72, 1724-72, 2212-72, 3740-72.     Filed December 2, 1975.

*Paul H. Frankel,* for the petitioners.
*Curtis W. Berner* and *Peter Matwiczyk,* for the respondent.

---

[1] The following cases are consolidated herewith: Robert Strickman and Rose Strickman, docket No. 1358-72; William W. Suitt and Kathryn S. Suitt, docket No. 1724-72; Robert S. Raum and Ruth Raum, docket No. 2212–72; Irving Rusoff and Perle Rusoff, docket No. 3740-72.

464

OPINION

## 1. *Ownership Issue*

Respondent seeks to deny the claimed charitable contributions on the ground that, as a result of the June 9, 1967, transaction, the trust became the owner of the filter, and the trust rather than petitioners made the July 7, 1967, transfer to Columbia. He contends that, since petitioners had already transferred all their interest in the filter to the trust, they could not have made a charitable contribution to Columbia.

Respondent's argument is without merit. Under the terms of the trust created by petitioners on June 9, 1967, the trustees are directed to "collect the net income or proceeds of sale" and to "make distribution thereof upon receipt to the Grantors in accordance with the percentages appearing alongside their signatures or in accordance with any writing dated subsequent hereto." Under section 677(a)(1),[5] the grantor of a trust is treated as the owner of any portion of a trust whose income may be "distributed to the grantor." Since the grantors of the June 9, 1967, trust were entitled to both the trust's income and the proceeds of the sale of the corpus, they are treated as the owners of the entire trust. Section 671 provides that where the grantor shall be treated as the owner of any portion of a trust, "there shall be included in computing the taxable income * * * of the grantor * * * items of income, deductions, and credits against tax of the trust." Accordingly, the grantors of the June 9, 1967, trust are entitled to take their respective proportionate shares of the trust's deductions in computing their taxable income. See *William Scheft,* 59 T.C. 428, 431-432 (1972); *Archbishop Samuel Trust,* 36 T.C. 641, 651 (1961), affd. 306 F.2d 682 (1st Cir. 1962).

That the grantors' deductions derived from the trust include the trust's charitable contributions is made doubly clear by the regulations. Section 1.671-3(a)(1), Income Tax Regs., provides that if a grantor is treated as the owner of an entire trust (corpus as well as ordinary income), he takes into account all items of

[5] SEC. 677. INCOME FOR BENEFIT OF GRANTOR.

(a) GENERAL RULE.—The grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be—

(1) distributed to the grantor or the grantor's spouse;

income, deductions, and credit "to which he would have been entitled had the trust not been in existence during the period he is treated as owner." Section 1.671-2(c), Income Tax Regs., states: "a charitable contribution made by a trust which is attributed to the grantor (an individual) under sections 671 through 677 will be aggregated with his other charitable contributions to determine their deductibility under the limitations of section 170(b)(1)."

Accordingly, any charitable contributions made by the June 9, 1967, trust would be deductible by petitioners. The issue remains, however, as to whether the trust made a "charitable contribution" of the filter to Columbia.

## 2. The Charitable Contribution Issue

Section 170 [6] allows as a deduction any "charitable contribution," payment of which is made during the taxable year. When the transfer at issue was made, a deduction was allowable under section 170 for a contribution of property, other than money, in an amount equal to its fair market value at the time of the contribution, sec. 1.170-1(c)(1), Income Tax Regs., and a gift of a patent could qualify as a charitable contribution. Rev. Rul. 58-260, 1958-1 C.B. 126. If the fair market value of the contributed property exceeded the allowable percentage of the taxpayer's adjusted gross income as computed for this purpose for the taxable year, such excess could be carried forward to the later years.

Petitioners contend that the trust's transaction with Columbia was a charitable contribution of one-half of the trust's interest in the filter and that, as settlors of a "grantor trust," [7] they are entitled to the maximum percentage allowable charitable contribution deductions in 1967 and to the carryovers of the unused balance to later years.[8] Respondent maintains, and we

---

[6] SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate.

[7] See secs. 671, 677; secs. 1.671-1, 1.671-3, Income Tax Regs.; *William Scheft*, 59 T.C. 428, 431-432 (1972); *Archbishop Samuel Trust*, 36 T.C. 641, 651 (1961), affd. 306 F.2d 682 (1st Cir. 1962).

[8] Petitioners compute their charitable contribution deductions by assigning a fair market value of approximately $20 million to the interest in the filter transferred to Columbia. The issue as to the filter's value has been severed for separate trial.

agree, that the trust's transaction with Columbia was not a "charitable contribution" within the meaning of section 170(a) and, consequently, the claimed deductions are not allowable.

The term "charitable contribution" has been generally held synonymous with the term "gift." *DeJong v. Commissioner,* 309 F.2d 373 (9th Cir. 1962), affg. 36 T.C. 896 (1961); *James A. McLaughlin,* 51 T.C. 233, 234 (1968), affd. per order (1st Cir., May 28, 1969); *Larry G. Sutton,* 57 T.C. 239, 242 (1971). "A gift is generally defined as a voluntary transfer of property by the owner * * * without consideration therefor." *Harold DeJong,* 36 T.C. at 899; *Larry G. Sutton, supra* at 242. If the transfer is impelled primarily by the anticipation of some economic benefit or is in fact an exchange in the form of a substantial quid pro quo, it is not a contribution. *Singer Co. v. United States,* 196 Ct. Cl. 90, 105-106, 449 F.2d 413, 422 (1971); *Stubbs v. United States,* 428 F.2d 885, 887 (9th Cir. 1970), cert. denied 400 U.S. 1009 (1971); *Rainier Companies, Inc.,* 61 T.C. 68, 77 (1973); *Charles O. Grinslade,* 59 T.C. 566, 577 (1973).

We must therefore inquire into what actuated petitioners in making the transfer to Columbia. The task is not to measure the extent to which pristine charitable benevolence prompted the transfer. Cf. *Commissioner v. Duberstein,* 363 U.S. 278, 285 (1960). Rather, our inquiry seeks to expose the true nature of the transaction: Whether the gift was made "in expectation of the receipt of certain specific direct economic benefits within the power of the recipient to bestow directly or indirectly, which otherwise might not be forthcoming." *Stubbs v. United States, supra* at 887; *Larry G. Sutton, supra* at 243. The issue is factual.

As we view the evidence in its entirety, it clearly shows that the transfer to Columbia was a business transaction, not a charitable contribution. In essence, the Strickman group, acting through the trust, created a joint venture with Columbia for the profitable, commercial exploitation of the filter. The trust and Columbia negotiated an agreement which both of them hoped and expected to be mutually advantageous. From this transaction, we infer that petitioners expected to receive, directly and indirectly, financial benefits fully commensurate with the value of the property transferred. See *Charles O. Grinslade, supra* at 577. In no sense of the term as it is used in section 170(a) was the transaction a "charitable contribution." Analysis of events

surrounding the transfer and the legal documents executed by the parties confirm this conclusion.

At the time the assignment agreement with Columbia was negotiated, the filter had been invented but needed testing and refining. Exploitation of the invention was expected to be an expensive and highly speculative venture. The Strickman group was aware of its own lack of credibility, its weakness vis-a-vis the powerful cigarette manufacturers, and the need for further development of the patent. Association with Columbia, a prestigious educational institution with a superior, widely known medical school, gave the filter valuable favorable publicity as well as credibility as a cancer deterrent. It also provided the leverage needed for dealing with the tobacco industry in developing a market for the filter. It was with these needs and potential benefits in mind that the Strickman group negotiated the transfer to Columbia.

The July 7, 1967, assignment agreement itself reflects an arrangement for the mutual advantage of the parties, a quid pro quo, not a charitable contribution. The agreement provides that the trustees "hereby *sell,* assign and transfer" (emphasis added) the invention to Columbia. At its own expense, Columbia agreed to prosecute the patent applications to issuance or rejection and to file and prosecute corresponding foreign patent applications in "such countries as it reasonably deems necessary in order to obtain the greatest revenue from its ownership of the Invention." Columbia undertook to "attempt to negotiate nonexclusive licenses, to manufacture, use or sell the Invention, with manufacturers of cigarettes, manufacturers of cigarette filters," and others throughout the tobacco industry. The agreement specified the minimum license and other fees to be charged. In addition, Columbia undertook at its own expense to protect the patent from infringement.

As "compensation for the assignment of the Invention and other considerations expressed" the Strickman group was to receive substantial and direct pecuniary benefits. Moreover, the Strickman group was to be relieved of negotiating and policing all licensing agreements as well as perfecting and protecting all patents, domestic and foreign. The trustees were to receive the percentages of the net royalties (ranging from 90 percent of the first $5 million to 49 percent of all amounts above $25 million) set forth in our Findings—income earned, in large part, by

Columbia's reputation and efforts. In the event the net royalties should not average at least $100,000 per year for any 3 consecutive calendar years beginning with 1971, and in other specified circumstances, the trust could give notice of termination of the agreement, and Columbia would be obligated to reconvey the filter to the trust. Indeed, because the trustees were dissatisfied with Columbia's initial steps in carrying out the agreement, the trustees gave notice of termination in mid-September 1967, less than 3 months after the agreement was signed—an action hardly consistent with a genuine donative intent.

The June 9, 1967, trust agreement executed less than a month before the agreement with Columbia does not even purport to authorize the trustees to make a gift of the trust property but, instead, empowers them to "sell" the invention to Columbia or any of its designees. The treasurer of Columbia testified that he "wanted the transfer to go through" because he "looked on it as a favorable business transaction for the university." As pointed out in our Findings, the language of the trust agreement with Columbia was carefully chosen with a view to obtaining the favorable "sale or exchange" treatment of patent income under section 1235. Every legal document executed in this whole transaction is phrased in the terms of a sale.

In sum, the tenor and content of the negotiations, the language of the documents of transfer, and all the surrounding facts are inconsistent with a genuine donative intent and are consistent with only one conclusion—this was a purely business transaction with no charitable element. See *Charles O. Grinslade, supra* at 577; *Rainier Companies, Inc., supra* at 77.

Petitioners dispute this conclusion, citing testimony that the parties intended in some way to give approximately half their interest to Columbia or that, if there was a sale, it was a bargain sale of the invention to Columbia with a contribution equal to the bargain element. In the face of cogent documentary evidence, petitioners now repudiate the work of their lawyers as inconsistent with their intentions and the substance of the transaction. We find no merit in these arguments.

All the petitioners, excluding Rusoff, were present at the meetings with Columbia where the format of the transaction and section 1235 capital gains treatment were discussed. Katz, who was the moving force behind the transfer, and Raum, an attorney

and leading member of the Strickman group, both participated in the drafting of the documents. Both were undoubtedly aware of the group's intention and what the group wanted accomplished. All the petitioners signed the trust agreement. Petitioners cannot be heard to disavow the efforts of their attorneys and other representatives acting on their behalf and dismiss these "formalities" as mere "lawyers' doings."

As far as we can tell from the evidence, the theory of a charitable contribution was an afterthought which was not conceived until after the mid-September notice of termination had been sent to Columbia, the spectre of the venture's failure was apparent, and, possibly, not until petitioners' 1967 returns were being prepared. This was too late. The history of a business transaction entered into with the hope and expectation of what one witness described as "astronomical" profits flowing to the trust cannot be rewritten to reflect a benevolent, charitable plan which unexpectedly failed.

Petitioners have simply failed to convince us that this transaction had any element of charity. True, both of Strickman's parents died of cancer, and he professed an interest in Columbia's cancer research. Raum testified he was willing to give to Columbia what he anticipated would be millions of dollars because his wife attended some graduate courses there. Suitt's daughter attended Columbia's school of general studies for a limited period of time. Rusoff was aware of Columbia's good work. These motivations are not commensurate with the generosity petitioners claim, especially when it is remembered that a notice of termination was sent to Columbia during the period the filter was being tested and within less than 3 months after the agreement was signed.

We do not doubt that petitioners intended to confer an economic benefit upon Columbia, nor that at least some of the petitioners hoped that Columbia would use the funds to further cancer research. However, the expected economic benefit to Columbia is identical to that conferred upon any person chosen to render services in return for compensation. That intention is insufficient to characterize the transfer as a charitable contribution within the meaning of section 170(a).

The issues decided above were severed for a separate trial by order dated March 13, 1974. Our conclusions herein obviate the necessity for a trial of the issue as to the valuation of the filter at

the time it was transferred to Columbia. The Court has not been advised, however, as to the disposition of other pleaded issues. The parties will be expected to file appropriate motions for the further handling of these cases.

*Appropriate orders will be issued.*