ROBERT P. OSBORNE AND CAROL A. OSBORNE,
PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 15999-84.        Filed September 4, 1986.

*R. Kenneth Sparks*, for the petitioners.
*Benjamin A. de Luna*, for the respondent.

FEATHERSTON, *Judge*: Respondent determined a deficiency in the amount of $14,307 in petitioners' Federal income tax for 1981. The issue for decision is: Whether petitioners are entitled to a deduction for a charitable contribution under section 170[1] for the installation and transfer of drainage facilities and easements to the City of Colorado Springs.

### FINDINGS OF FACT

Petitioners Robert P. Osborne and Carol A. Osborne, husband and wife, resided in Colorado Springs, Colorado, at the time the petition was filed. Petitioners filed a joint Federal income tax return for the taxable year 1981 with the Internal Revenue Service Center, Ogden, Utah.

---

[1] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise noted.

Petitioner Robert P. Osborne (hereinafter referred to as petitioner) is in the business of real estate development and construction contracting. In 1979, petitioner acquired for development the first of seven contiguous parcels of property constituting one-half city block located on Pikes Peak Avenue in Colorado Springs, Colorado, between El Paso and Prospect Streets. See the diagram on page 577.

Parcel 1, approximately 52,000 square feet of land and four small buildings, is situated on the north side of Pikes Peak Avenue and was acquired by petitioner on October 18, 1979. At that time, the City of Colorado Springs (city) owned parcel 3, a tract of land consisting of approximately 29,153 square feet adjacent to the west side of parcel 1, the north side of Pikes Peak Avenue and the east side of El Paso Street. The city had acquired parcel 3 in connection with a road construction project designed to link Pikes Peak Avenue to Colorado Avenue and create a major east-west arterial through Colorado Springs.

Running diagonally through parcel 3 and the corner of parcel 1 is Shook's Run, a natural ditch drainage system in Colorado Springs. For years the city had experienced problems with the Shook's Run drainage system, including bank stabilization, drainage control into the channel, and maintenance of the channel. Consequently, the city implemented the Shook's Run Project to improve Shook's Run by rehabilitating the channel, buying houses and removing them from the banks, and building parks and bicycle trails designed to clean up and stabilize the area.

Shook's Run, located in an older part of Colorado Springs, is exempt from the city's drainage regulations. Consequently, landowners have no obligation to build or pay for drainage facilities in Shook's Run. Rather, the city, through its Department of Public Works, is responsible for the safe discharge of waters within the Shook's Run drainage system.

In May 1980, a serious flood occurred causing erosion in the vicinity of Shook's Run over parcels 1 and 3. The flood waters came down Shook's Run basin, crumpled the corrugated metal pipe culvert lining the open ditch into the

concrete tunnel under Pikes Peak Avenue, and backed up, flooding the street and causing severe erosion.

The city initially barricaded the eroded area and removed the corrugated pipe and debris from the channel. The city then solicited contractors' bids on a project entitled "Repair of Headwall at Shooks Run at Pikes Peak Ave.," and received a low bid of $93,464. The repairs contemplated by the city under this project consisted of an open ditch concrete wing wall construction designed to stabilize the channel, stop the erosion, and make the area temporarily safe. The contemplated repairs would not have provided a permanent solution to the Shook's Run drainage problems, but they would have allowed the city to "buy some time." Although for a cost of approximately $93,464 the city could correct the current erosion problem and make conditions safer, it would remain obligated to make permanent improvements in the channel at a later time. By November 1980, no repairs had been effected by the city.

On November 11, 1980, petitioner purchased parcel 2, approximately 7,105 square feet of land adjacent to the west side of parcel 1 and the north side of parcel 3. On November 21, 1980, petitioner acquired parcel 3 from the city in exchange for like kind property owned by petitioner pursuant to an Agreement to Exchange Real Estate (exchange agreement). Under the exchange agreement, petitioner warranted the following:

7. *Warranties of Osborne.* Osborne hereby warrants the following:

(1) That Osborne shall use best efforts to close and consummate this transaction.

(2) That Osborne, upon closing shall take steps to repair and correct erosion on the premises of * * * [parcel 3]. Osborne further warrants that such corrective measures shall be in accordance with proper engineering standards. The plan to correct and repair the problem shall be submitted to the Department of Public Works for the City of Colorado Springs for review and approval prior to beginning the corrective work and prior to development of the tract. Corrective work to be completed by October 1, 1981.

(3) Osborne further warrants that he shall submit a development plan on * * * [parcel 3] to the City Planning Department for review prior to obtaining any building permits.

In fulfilling his obligation to repair and correct erosion on parcel 3 under section 7(2) of the exchange agreement,

petitioner could have installed a concrete wing wall leaving an open ditch, lined the natural ditch with "riprap or gabions," or constructed an enclosed concrete box culvert in the channel.

In the months following his acquisition of parcel 3, petitioner acquired the following parcels of land: parcel 4, approximately 4,600 square feet adjacent to the east side of El Paso Street and the north side of parcel 3, purchased on December 17, 1980; parcel 5, approximately 2,700 square feet adjacent to the north side of parcel 3 and directly between parcels 2 and 4, purchased March 14, 1981; and parcel 6, approximately 18,000 square feet adjacent to the east side of parcel 1 and the north side of Pikes Peak Avenue, acquired on September 29, 1981.[2]

Beginning in March or April 1981, petitioner caused to be constructed drainage facilities over all six parcels described above, consisting primarily of a concrete box culvert enclosing the Shook's Run basin running diagonally from the east side of El Paso Street in a southeast direction to the north side of Pikes Peak Avenue. The drainage facilities also included corrugated metal drainage pipe tie-ins: a 54-inch metal pipe running north-south over parcel 2 feeding into the box culvert and a 48-inch metal pipe running east-west over parcels 6, 1, and 2, feeding into the north-south tie-in. The box culvert itself is constructed of steel-reinforced concrete with a flat bottom, three vertical walls, and a flat top forming twin rectangular conduits. The culvert is covered with a layer of dirt and the ground above the culvert is graded level. The box culvert is designed to carry as maximum dead weight four feet of earth and automobiles. Construction of the drainage facilities was completed sometime between August 1 and October 1, 1981, at a cost of $182,594 paid by petitioner in 1981.

Construction of the box culvert benefited the public by stopping erosion, controlling flooding, providing drainage collection, and relieving the city of its obligation to correct the problem created by the flooding of Shook's Run.

On December 21, 1981, petitioner transferred the box culvert and related drainage facilities to the city and

---

[2]Petitioners also acquired, sometime before the trial, the parcel of land adjacent to the east side of parcel 6, the west side of Prospect Street, and the north side of Pikes Peak Avenue.

granted it easements over all the ground through which the box culvert and related improvements ran. The city encouraged petitioner to make the transfers and grant the easements primarily to obtain "overall maintenance control" and to allow the city to "protect construction adjacent to the channel." In transferring the box culvert and granting the easements, petitioner was obligated to maintain the box culvert only for a 1-year warranty period. The box culvert has required no maintenance from the time of its installation up to the time of trial, and is not likely to require maintenance for a considerable number of years.

The fair market value of the assembled ground with the box culvert in place prior to the conveyance of the easement to the city was $5 per square foot, and the highest and best use for the property would have been for commercial real estate development for which it is zoned.

Petitioners' 1981 return reflects a "gift" to the city valued at $275,849 ($182,594 for the cost of the drainage facilities and $93,255 for the value of the easements). Petitioners claimed a deduction for a charitable contribution in the amount of $30,890 on their 1981 income tax return. The percentage limitation of section 170(b) limits the amount petitioners may have as a deduction for 1981 to that amount. Petitioner now concedes that $93,464 of the cost of constructing the drainage facilities ($182,594) is not deductible as a charitable contribution because it represents petitioner's performance under the exchange agreement.

## OPINION

The issue for our decision is whether petitioners are entitled to a charitable contribution deduction under section 170[3] for the value of the drainage facilities transferred and

---

[3]SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

      *      *      *      *      *      *      *

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

(1) A State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.

easements granted to the City of Colorado Springs in 1981. Section 170(a) allows a deduction for any "charitable contribution." This includes, under subsection (c), a charitable contribution to a State or political subdivision thereof, provided the gift is made for "exclusively public purposes." The City of Colorado Springs qualifies as a political subdivision of a State, and we have found that the drainage facilities and easements, to the extent they constitute a contribution, were to be used for public purposes. The issue, therefore, is whether the installation and transfer of the drainage facilities and granting of the easement rights constituted a "charitable contribution" within the meaning of section 170.

The term "charitable contribution" is synonymous with the word "gift." *Sutton v. Commissioner*, 57 T.C. 239, 242 (1971); *DeJong v. Commissioner*, 36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962). "A gift is generally defined as a voluntary transfer of property by the owner to another without consideration therefor. If a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows from the performance of a generous act, it is not a gift." *DeJong v. Commissioner*, 36 T.C. at 899; *Bogardus v. Commissioner*, 302 U.S. 34, 41 (1937). "If the transfer is impelled primarily by the anticipation of some economic benefit or is in fact an exchange in the form of a substantial quid pro quo, it is not a contribution." *Rusoff v. Commissioner*, 65 T.C. 459, 469 (1975), affd. 556 F.2d 559 (2d Cir. 1977).

These principles have been applied in a variety of factual situations cited by respondent to deny charitable contribution deductions where taxpayers transferred property (1) pursuant to a contractual obligation or local ordinance, (2) in exchange for a zoning change or building permit, or (3) in exchange for a promise by the city to construct schools or widen roads. *Stubbs v. United States*, 428 F.2d 885, 887 (9th Cir. 1970); *Wolfe v. Commissioner*, 54 T.C. 1707 (1970).[4] See also *Sutton v. Commissioner*, 57 T.C. 239, 242 (1971); *Perlmutter v. Commissioner*, 45 T.C. 311 (1965).

Petitioner's situation, however, is not the usual one. Unlike the taxpayers in the cited cases, petitioner con-

---

[4]*Dockery v. Commissioner*, T.C. Memo. 1978-63.

structed and installed drainage facilities on his own property and transferred them to the city without legal or contractual compulsion; further, petitioner neither expected nor received from the city any significant action, promise, or permission in exchange for his transfer.[5] However, the construction of the box culvert, while serving a public purpose, enhanced the value of petitioner's property surrounding Shook's Run. We think petitioner's construction, installation, and transfer of the box culvert and related drainage facilities along with the easements, had a dual character and included both deductible and nondeductible elements. See *United States v. American Bar Endowment*, 477 U.S. ___, ___ (1986); *DeJong v. Commissioner*, 36 T.C. at 899-900; *Considine v. Commissioner*, 74 T.C. 955, 968 (1980).

On the one hand, petitioner relieved the city of its then current obligation to correct erosion caused by flooding and to install correctional drainage facilities in Shook's Run.[6] In addition, by constructing a box culvert rather than an open wing wall or less permanent structure, petitioner relieved the city of its obligation to improve drainage facilities in Shook's Run for the indefinite future. Moreover, the city preferred the more expensive and long lasting box culvert type of facility and encouraged petitioner to transfer the improvements. The transfer of the drainage facilities and easements to the city gave the city maintenance control and allowed it to protect construction adjacent to the channel. Petitioner was not obligated under local ordinances to improve the drainage basin which ran through his land or to dedicate any portion of his property for the city to do so, and was at no time legally or contractually obligated to transfer the drainage facilities.

On the other hand, by installing a concrete box culvert, petitioner created new land over the Shook's Run channel and increased the value of his land surrounding the channel.

---

[5]Respondent argues that in exchange for petitioner's easement grants, the city agreed to maintain the drainage facilities. This argument is considered in our discussion, *infra*.

[6]Respondent argues that petitioner's box culvert construction merely fulfilled his obligation to the city under the exchange agreement and was therefore not a gift. Petitioner has agreed that $93,464 of his expenditures represented his performance under that contract; however, we think petitioner exceeded his contractual obligation by installing a box culvert because his promise to repair and correct the erosion problem: (1) Could have been fulfilled through a less expensive and less permanent means, and (2) was limited to parcel 3.

The box culvert is completely encased in concrete and covered with earth to form a contiguous piece of land unlike a concrete wing wall or riprap lining which leaves an open ditch. Choosing the box culvert type of construction thus permitted petitioner to use this "new land" as a parking lot or landscaped area and improve the appearance and utility of his surrounding properties.

The cost of petitioner's improvements to his own land are not "direct economic benefits" bestowed on him directly or indirectly by the city (*Stubbs v. United States*, 428 F.2d at 887; *Sutton v. Commissioner*, 57 T.C. at 243), nor are they "incidental" in nature, as petitioner claims (*Myers v. United States*, 81-1 USTC par. 9179 (N.D. Ala. 1980); *Citizens & Southern National Bank of S.C. v. United States*, 243 F. Supp. 900, 906 (W.D. S.C. 1965)). Rather, they represent nondeductible capital expenditures incurred by petitioner to improve his property and as such must be added to his basis in the property. Sec. 263(a)(1); see *Mt. Morris Drive-In Theatre Co. v. Commissioner*, 238 F.2d 85, 86 (6th Cir. 1956), affg. per curiam 25 T.C. 272 (1955).

Therefore, to the extent petitioner improved his own property by installing the box culvert and related facilities, his expenditures must be capitalized; to the extent that petitioner gratuitously benefited the city by providing permanent rather than temporary drainage facilities in Shook's Run, and by conveying the easements, he is entitled to a charitable contribution deduction.

The easements over the installed drainage system facilitated the city's ingress and egress over the property to repair and maintain the system and gave the city more direct control over construction adjacent to the Shook's Run channel. Respondent argues that because the city agreed to maintain the drainage facilities after the first year, petitioner received a "quid pro quo" for his easement grants to the city. See *Singer Co. v. United States*, 196 Ct. Cl. 90, 449 F.2d 413, 423 (1971).

We disagree. First, petitioner was not looking to free himself of the obligation to maintain the facility. Rather, he granted the easements at the request of the city, which for its own reasons as a municipality desired to control the repair and maintenance of the drainage facilities. Second, as

of the date of trial, the box culvert had required no maintenance and is not likely to require repairs or maintenance for years to come. Any benefit petitioner received as a result of the city's assumption of maintenance responsibilities was incidental. Therefore, petitioners' charitable contribution deduction must take into account the value of the easement rights granted to the city in 1981.

In determining the amount of the charitable contribution deduction, we must consider a number of factors including the city's obligation to provide safe drainage facilities in the Shook's Run basin; the value to the city of the discharge of this obligation for the indefinite future; the value to the city of obtaining the easements and ownership of the culvert and related facilities to enable it to control future repairs and maintenance; the value added to petitioner's land by the box culvert construction as compared with an open wing wall or other similar structure; the diminution in value attributable to petitioner's relinquishment and the city's ownership of the easements over the land; and other pertinent considerations.

To assist in making the required determination in this unusual factual situation, we have the benefit of the reports and testimony of three experts. Petitioner's expert, Frank J. Parisi (Parisi), values all of petitioner's land at $5 per square foot before the easements were granted and $3 per square foot for parcels 2, 3, 4, and 5 after the easements were conveyed, arriving at a value of $87,000 for the easements.[7]

The views of one of respondent's experts were so extreme as to be of little assistance. The report of T. Patrick Luna (Luna), however, contains a helpful analysis. Based on an examination of sales of comparable property, Luna's report shows that parcels 2, 3, 4, and 5, the part of petitioner's property directly affected by the easements, would have had a value of $1.80 to $2 per square foot improved only with a floodway ditch. After petitioner's improvements were made

---

[7]Both petitioner's expert, Frank J. Parisi, and respondent's expert, T. Patrick Luna, agree that the easement which transverses the northern sections of parcels 1 and 6 has little or no effect on the value of those two parcels. The experts concentrated their analysis, therefore, on the diminution in value to petitioner's parcels 2, 3, 4, and 5 attributable to the grant of the easements. Based on the experts' reports and testimony, we find that the easements had little or no effect on the value or utility of parcels 1 and 6.

on these parcels and before the easements were granted, Luna's report places a value of \$4.50 to \$5 per square foot on the property. "Thus," his report states, "the value of the subject's remainder property lies within two extremes: (1) \$1.80—\$2.00/sq. ft. which represents an easement limiting any and all construction or use by the owner, and (2) \$4.50 to \$5.00/sq. ft. which represents the property unrestricted by any easement." Taking into account the use that could be made of the property covered by the easements, Luna reduced the value of these four parcels by \$0.90 to \$1 per square foot (\$17,000 to \$19,000) for the easements themselves plus a "severance effect to the remainder of the property" for an additional adjustment of \$5,000 to \$7,000. He defines "severance effect" as "the reduction in market value of the remainder parcel resulting" from the grant of the easements. On this basis he arrives at a value of \$22,000 to \$26,000. This analysis reflects both the increase in value of petitioner's land attributable to the improvements and the value of the easements.

We are in basic agreement with Luna's approach to a determination of the amount of the allowable deduction. In our view, however, Luna understates the severance effect of the easements on the use of parcels 2, 3, 4, and 5. His testimony shows that he thought that a building could be constructed over the easements. While constructing such a building might be legally permissible, it would be impractical. Such a building, according to the testimony of other witnesses, would have to be so designed that the pilings or other foundation on which it rested would not adversely affect the underground drainage facilities. Further, any structure over the easements would be subject to removal if repair of the drainage facilities became necessary. As we view the evidence, the city would not likely grant a building permit for such a structure and, if it did, no lending institution would make a loan for financing a building constructed over the easements. Moreover, the easements cover a major portion of parcels 4 and 5 and leave the portions of parcels 2 and 3 not covered by the easements as irregularly shaped and disjointed tracts. For all practical purposes, parcels 2, 3, 4, and 5 could be used only for decorative landscaping, parking facilities, or some sort of

temporary structure. Therefore, we think a more reasonable value for these four parcels with the improvements in place and the easements conveyed is the $3 per square foot figure reported by petitioner's expert, Parisi. This reflects a net benefit of $1 per square foot derived from the installation of the underground, as opposed to the open ditch, drainage facilities on those four parcels.

Taking into account the value the land would have had with an open ditch, the increase in value attributable to the box culvert, the effect of the grant of the easements, the excess expenditures incurred by petitioner for the underground installation, and all other relevant evidence, we find that petitioners are entitled to a total deduction of $45,000 for their contribution of the installed facilities and easements to the city.

Although our finding as to the amount of the charitable deduction is less than the total amount claimed, it exceeds the deduction allowable under section 170(b) for 1981. Accordingly,

*Decision will be entered for the petitioners.*